995 F.2d 1158
 RICO Bus.Disp.Guide 8310
 STOCHASTIC DECISIONS, INC., Plaintiff-Appellant-Cross-Appellee,
v.
James DiDOMENICO; Anthony DiDomenico; Carol DiDomenico;
DCJM Realty Corp.; Carol Coaches, Inc.; J.D. Enterprises,
Inc.; Southgate Bus Service; Arthur Wagner; Lucille
Wagner; Wagner, McNiff & DiMaio; T. Gluck & Co., Inc.;
and Michael Berke, Defendants-Appellees-Cross-Appellants,
Kingsbury-Putney, Inc.; Geoffrey Ashby; and Thomas Miral,
Defendants.
 Nos. 110, 111, 112, Dockets 92-7303, 92-7321, 92-7383.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 21, 1992.
Decided June 4, 1993.
 
 Helen Davis Chaitman, New York City (Jody B. Keltz, Georgia McMillen, Scott Turner, Ross & Hardies, New York City, of counsel), for plaintiff-appellant-cross-appellee.
 Michael R. Perle, Weehawken, NJ (Barry A. Tessler, New York City, Hayden, Perle & Silber, Weehawken, NJ, of counsel), for defendants-appellees-cross appellants Arthur Wagner, Lucille Wagner, Wagner, McNiff & DiMaio, T. Gluck & Co., Inc., and Michael Berke.
 Ronald G. Russo, New York City, for defendants-appellees-cross-appellants James DiDomenico, Anthony DiDomenico, Carol DiDomenico, DCJM Realty Corp., Carol Coaches, Inc., J.D. Enterprises, Inc., and Southgate Bus Service.
 Before: VAN GRAAFEILAND, WINTER, and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiff-appellant-cross-appellee Stochastic Decisions, Inc. ("Stochastic") appeals from a final judgment entered November 19, 1991, an order for turnover of funds and securities and other relief entered January 28, 1992, and a supplemental final judgment entered February 27, 1992 in the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge. The final judgment found defendants-appellees-cross-appellants James DiDomenico ("James"), Anthony DiDomenico ("Anthony"), Carol DiDomenico ("Carol"), DCJM Realty Corp. ("DCJM"), Carol Coaches, Inc. ("Carol Coaches"), J.D. Enterprises, Inc. ("JD Enterprises"), Southgate Bus Service ("Southgate"), Arthur Wagner ("Wagner"), and Wagner, McNiff & DiMaio ("Wagner McNiff"), and defendant Kingsbury-Putney, Inc. ("Kingsbury")[1] liable to Stochastic on its claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 (1988) et seq., and on its state law fraudulent conveyance and common law fraud claims. The district court dismissed plaintiff's complaint against defendants Geoffrey Ashby and Thomas Miral with the consent of Stochastic. The supplemental final judgment accordingly dismissed the complaint with prejudice against them, and also against defendants-appellees-cross-appellants Lucille Wagner, T. Gluck & Co., Inc. ("Gluck"), and Michael Berke, whom the court found not liable on Stochastic's claims. Stochastic contends that the district court erred in its allowance of damages and attorney fees, and in its dismissal as to Lucille Wagner, Berke, and Gluck.[2]
 
 
 2
 Defendants - appellees - cross - appellants ("Cross-Appellants") cross-appeal, contesting the district court's determinations as to liability, damages, and attorney fees.[3]
 
 
 3
 We affirm the final judgment and supplemental final judgment of the district court.
 
 Background
 
 4
 From 1982 through June 1985, Stochastic provided insurance brokerage services to all of the corporations owned by Anthony (husband) and Carol (wife) that were in the interstate bus transportation business. Stochastic also purchased two buses that it leased to Anthony and Carol's former operating company, Eagle Bus, Inc. ("Eagle").
 
 
 5
 In 1984, Anthony and Carol and their corporations fell behind in their payment of insurance premiums to Stochastic. In order to pay Stochastic and other creditors, Anthony indicated that he and Carol would sell some of their real estate. In the fall of 1984, the DiDomenicos retained Wagner and his law firm, Wagner McNiff, to represent them in various actions brought against them as guarantors of obligations of Eagle.
 
 
 6
 In October 1985, allegedly unbeknownst to Wagner, Eagle filed for reorganization under Chapter 11. At the time, Eagle owed approximately $2.3 million in secured claims, and Stochastic was listed as an unsecured creditor having a $165,000 claim. Stochastic asserts that Anthony and Carol filed misleading reports during the bankruptcy, fraudulently transferred Eagle's assets to Carol Coaches and others, and paid their personal living expenses under the guise of "officer's loans." A garage in Staten Island (the "Garage") was one of the assets allegedly transferred from Eagle to Carol Coaches without disclosure to the bankruptcy court and without consideration.
 
 
 7
 Ultimately, the bankruptcy petition was dismissed when Eagle failed to file financial reports. No Eagle creditors were ever paid. Stochastic alleges that Anthony and Carol continued to have their living expenses paid by Carol Coaches and thereafter by Southgate, Anthony and Carol's current bus operating company, formed by Wagner McNiff after Stochastic obtained a judgment against Carol Coaches.
 
 
 8
 Following the bankruptcy of Eagle, Anthony and Carol arranged for Wagner and Wagner McNiff to take control of essentially all of their assets and much of what were, at least on their face, the assets of James (son of Anthony and Carol), to whom Anthony and Carol were then transferring most of their own assets. The district court found that Wagner thereafter used these assets, which were adequate to pay all of the debts of the DiDomenicos and their companies, to settle some of those debts, to pay personal expenses of Anthony and Carol and business expenses of James, to pay fees to Wagner and Wagner McNiff, and to pay Wagner's personal family expenses.
 
 
 9
 On January 10, 1986, Stochastic instituted a suit in New Jersey Superior Court to recover unpaid insurance premiums against James, Carol Coaches, DCJM, and two other bus companies operated by Anthony and Carol. Stochastic Decisions, Inc. v. James DiDomenico, No. L-009868-86 (N.J.Super.Ct.Law Div.) (the "Insurance Case "). Stochastic alleged that James was authorized to sign checks on behalf of Eagle, and had issued several Eagle checks to Stochastic in payment of insurance premiums for the corporate defendants that were returned for insufficient funds, or on which James stopped payment. Stochastic further alleged that James' fraudulent acts deprived him of the protection of the corporate veil under New Jersey law.
 
 
 10
 On June 13, 1988, judgment was entered in favor of Stochastic. The court held that: (1) the corporate defendants were liable for $175,564 in compensatory damages and $46,584.92 in prejudgment interest; and (2) James was personally liable for $41,265 of the compensatory damages plus $10,949.42 of prejudgment interest, and $100,000 in punitive damages. The court indicated that it would consider rescinding the punitive damages award if Stochastic received payment of the balance of the judgment.
 
 
 11
 On October 31, 1988, Stochastic moved in New York Supreme Court, Richmond County for the appointment of a receiver for James, Carol Coaches, and DCJM, contending that James and the corporations had been determined by the New Jersey court to have fraudulently transferred assets. On December 6, 1988, a receiver was appointed, and ascertained that $150,000 would be available by the end of that month for payment of the Insurance Case judgment as a result of Stochastic's levy upon a contract between the New York City Board of Education and one of the Insurance Case defendants.
 
 
 12
 The Insurance Case judgment was ultimately affirmed by the Appellate Division of the Superior Court, and certification was denied by the New Jersey Supreme Court. No. A-5827-87T1 (N.J.Super.Ct.App.Div. Oct. 30, 1989), certification denied, No. C-502 (N.J. Jan. 25, 1990). Stochastic eventually recovered the full amount of the judgment subsequent to the filing of the instant action.
 
 
 13
 Stochastic also filed suit on January 10, 1986 in New Jersey Superior Court against Anthony and Carol as guarantors of Eagle's obligations under the bus lease with Stochastic. Stochastic Decisions, Inc. v. Anthony DiDomenico, No. L-010054-86 (N.J.Super.Ct.Law Div.) (the "Guarantee Case "). On April 10, 1989, Stochastic obtained a judgment in the amount of $474,150.38. On September 7, 1989, Stochastic was awarded an additional judgment of $19,338.38 for legal fees and expenses incurred in the Guarantee Case. No appeal has been taken from these judgments. Stochastic apparently has not filed these judgments in New York, and they remain unpaid.
 
 
 14
 In 1986, Wagner proposed to Anthony and Carol that the Garage be sold, and allegedly developed a plan to conceal the proceeds of the sale from Eagle's creditors. In December 1984, the Garage had been used by Anthony and Carol to secure a $499,000 loan to Eagle from Gateway State Bank ("Gateway"). In addition, Anthony and Carol personally guaranteed the loan, and pledged fifteen acres of land in Staten Island (the "Vacant Land") and their Bayonne residence (the "Residence") as collateral. The loan closing was handled by DiMaio, an employee of, and alleged partner in, Wagner McNiff. See supra note 2.
 
 
 15
 The Garage was sold for $2.1 million in May 1987. The Gateway mortgage was satisfied from the proceeds of this sale, but Wagner arranged for the mortgage to be assigned by Gateway to Wagner's son-in-law, Berke, as a continuing encumbrance upon the Vacant Land and the Residence.
 
 
 16
 Wagner, on behalf of Berke, then proceeded with a foreclosure action against the Residence that had initially been instituted by Gateway prior to the full satisfaction of its mortgage. Berke v. Anthony DiDomenico, No. F-5186-88 (N.J.Super.Ct.Ch.Div.) (the "Foreclosure Case"); see also Gateway State Bank v. DCJM Realty Corp., No. F-6628-86 (N.J.Super.Ct.Ch.Div.) (original foreclosure action by Gateway). The complaint in the Foreclosure Case was amended on December 28, 1988 to name Stochastic as a defendant, but the amended complaint was not served upon Stochastic until February 14, 1989.
 
 
 17
 After a question arose in the foreclosure proceedings whether Berke had paid consideration for the assignment of the mortgage on the Residence, Berke's counsel wrote a letter to the court dated December 11, 1987 that enclosed a check from Berke to Wagner McNiff dated December 10, 1987 in the amount of $249,139.48 as evidence of such payment. Wagner subsequently admitted in testimony at the trial of the instant case, however, that "the 247 or 249 was never actually put up by [Berke]. It was put up by money that we advanced to him out of the Carol Coaches mortgage for the purpose of attempting to insulate the elder DiDomenico's family home in Bayonne, New Jersey." This testimony is confirmed by documentary evidence of a $250,000 wire transfer to Berke on December 7, 1987.
 
 
 18
 The New Jersey chancery court ultimately determined that there was "a very neat, contrived, controlled plan of both Wagner and [Berke]" designed "for the purpose of causing a fraudulent conveyance [to] insulat[e] a judgment [debtor] from ... creditors," and granted summary judgment against Berke in the foreclosure proceeding on October 31, 1990.
 
 
 19
 On June 6, 1988, just prior to the entry of judgment in the Insurance Case, James, upon Wagner's instructions, executed a deed on behalf of DCJM that transferred the Vacant Land to Kingsbury for nominal cash and an assumption of existing obligations. Kingsbury was a shell corporation recently formed for this purpose whose nominal shareholder was a Wagner McNiff client. Wagner testified in the instant action that the transfer was intended "to safeguard the property" against seizure for execution of the forthcoming judgment in the Insurance Case.
 
 
 20
 After transferring the Vacant Land, Wagner solicited $350,000 from clients, the principals of Gluck, for an unspecified investment, which took the form of a loan to Wagner in that amount. The $350,000 check was made out to Paradise Properties, an entity controlled by Wagner. After the loan was made, Wagner had Kingsbury execute a $425,000 mortgage on the Vacant Land to Gluck. Wagner testified at this action that the purpose of the mortgage was "to put another step between the property and Stochastic." Gluck apparently never requested a mortgage, and remained unaware of the mortgage until shortly before a principal of Gluck was deposed in the instant case.
 
 
 21
 On January 31, 1989, Stochastic filed the instant action in the United States District Court for the Eastern District of New York, alleging that the defendants engaged in a civil RICO conspiracy involving bankruptcy fraud, wire fraud, and mail fraud to prevent Stochastic from collecting the amounts it was owed. The complaint also alleged that the property transfers effected in the course of the conspiracy were fraudulent conveyances under applicable state law, and that the overall scheme constituted common law fraud.
 
 
 22
 After a twelve-day bench trial, the district court awarded judgment to Stochastic on all its claims against most of the defendants. See supra text accompanying note 1. The court found that Wagner and Wagner McNiff developed a plan to block Stochastic's attempts to collect on its judgments, and in the execution of that plan "used dummy corporations, dummy sales and mortgages, trust and special accounts of [Wagner McNiff], and nominees who had no understanding of how they were being used, including Wagner's son-in-law, some of his country club friends, and clients." The court further found that the resulting conspiracy continued over a period of five years, and "included the commission of scores of wire frauds and scores of mail frauds."
 
 
 23
 The court stated that "[p]articular attention was devoted by the coconspirators to protecting the Vacant Land so that Wagner and [Wagner McNiff] could ultimately profit from its sale," and that Wagner's intention in that regard was to "cheat[ ] the elder DiDomenicos out of their last substantial asset" for his own personal benefit. The court also found that DiMaio individually was not responsible for any of the RICO predicate acts, and that Wagner McNiff "was not a bona fide partnership although it held itself out to the public as a general partnership." See supra note 2.
 
 
 24
 The court awarded Stochastic: (i) $467,477.24 on its civil RICO claim; (ii) $689,930.70 on its claim for violations of New York State fraudulent conveyance law; and (iii) $589,930.70 on its claim of common law fraud. The court further ruled that the first and second claims, totalling $1,157,407.94, could be independently recovered; that the second and third claims, on the other hand, could not be independently recovered, but were mutually exclusive; but that if judgment on the second claim was reversed, Stochastic could recover on the third. Ancillary equitable relief was also granted to effectuate collection of the monetary awards.
 
 
 25
 With respect to the civil RICO award, the court designated as RICO damages $50,000 in legal fees expended by the plaintiff in attempting to collect its New Jersey judgments. $71,976.26 was originally billed "for this phase of legal services," of which the court determined $5,100 was not properly related RICO damages and $16,876.26 was excessive. In accordance with 18 U.S.C. § 1964(c) (1988), the resulting $50,000 amount was trebled because it was deemed "damages attributable and foreseeable [by] the conspirators, result[ing] directly from the RICO violations."
 
 
 26
 The court also awarded the plaintiff $317,477.24 in RICO attorney fees and expenses pursuant to § 1964(c), calculated as follows. Stochastic's counsel billed $497,477.24 for pursuing the instant case. The court subtracted $80,000 which was deemed "unreasonably excessive litigation," and the resulting amount was determined to be "an entirely reasonable sum given the difficulty of this kind of litigation." Of the remaining sum, $100,000 was allocated to fees and expenses involved in pursuing the fraudulent conveyance claim.
 
 
 27
 The $689,930.70 award on the fraudulent conveyance claim represented the amount due on the outstanding Guarantee Case judgment with applicable interest, plus $100,000 in legal fees. Finally, in the event that the fraudulent conveyance award was reversed, the district court awarded Stochastic $589,930.70 on its claim for common law fraud, but specified that attorney fees were unavailable on this claim.
 
 
 28
 This appeal, and the related cross-appeals, followed.
 
 Discussion
 
 29
 Stochastic contends on appeal that the district court erred: (1) in not trebling Stochastic's entire damage claim (i.e., the amount owed to Stochastic by the defendants on January 31, 1989 when Stochastic commenced this lawsuit, assertedly $924,428.66, the legal fee incurred in obtaining the New Jersey judgment, and the unreduced legal fees of $71,976.26 billed in connection with collection of the New Jersey judgments); (2) by wrongly disallowing $180,000 of Stochastic's claimed legal fees in ascertaining the RICO attorney fee recoverable pursuant to § 1964(c); and (3) in finding Lucille Wagner, DiMaio, Gluck, and Berke not liable to Stochastic as RICO conspirators. Cross-Appellants counter all these arguments, and on cross-appeal maintain that: (1) the district court erred (a) in determining that any of the legal fees expended by Stochastic in collecting its New Jersey judgments constituted RICO damages, and (b) by awarding an excessive attorney fee to Stochastic on its RICO claim; (2) New Jersey's "entire controversy" doctrine bars Stochastic from asserting any of its claims in the instant action; and (3) Wagner was improperly held liable under the fraudulent conveyance and fraud counts for the amount of the Guarantee Case judgment. We proceed to the consideration of all these issues.
 
 
 30
 A. RICO Damages.
 
 
 31
 Section 1964(c) provides that: "Any person injured in his business or property by reason of a [RICO] violation ... shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The district court determined that Stochastic was not entitled to the amounts owed on the Insurance Case or Guarantee Case judgments or the respective attorney fees in litigating those complaints as part of its RICO damages. The district court held, however, that the attorney fees expended in pursuing collection of the judgments constituted RICO damages and were subject to trebling. On appeal, Stochastic contends that the district court erred by not trebling the amount that remained uncollected on amounts owed to it by Cross-Appellants at the time it instituted this lawsuit, as well as the attorney fees expended in obtaining the New Jersey judgments and in postjudgment collection efforts. Cross-appellants contend that attorney fees were improperly considered RICO damages.
 
 
 32
 1. "Lost Debt" Damages.
 
 
 33
 Stochastic premises its claim of entitlement to a trebling of the amount owed it by Cross-Appellants when it instituted this lawsuit principally upon our decision in Bankers Trust Co. v. Rhoades, 859 F.2d 1096 (2d Cir.1988), cert. denied, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). In that case, Bankers Trust had consented, as a creditor, to a debtor's reorganization plan under which Bankers Trust received only 17.5% of its allowed claim. Id. at 1098. Neither the court nor the creditors, however, were aware that the debtor had fraudulently conveyed ownership of a corporation with net assets in excess of $3 million. Id. Bankers Trust subsequently claimed RICO injury for, inter alia, its "loss of legitimate debt ... when, relying on defendants' misrepresentations, it accepted [the] bankruptcy reorganization plan...." Id. at 1105. We held that the damages were " 'unrecoverable,' at least at [the time of the litigation], because 'their accrual is speculative' and 'their amount and nature unprovable' " in light of the ongoing proceeding in the bankruptcy court to remedy the fraudulent conveyance. Id. at 1106 (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)).
 
 
 34
 Stochastic asserts that in accordance with Bankers Trust, because the Eagle bankruptcy was terminated without any payment to creditors and the amount of Stochastic's "lost debt" was definitively determined by entry of the New Jersey judgments, that amount should have been considered part of Stochastic's RICO injury. We disagree. The amount of the lost debt in the instant case, as in Bankers Trust, remains unprovable. In Bankers Trust, the amount of the bank's claim was definite, but the amount of its "lost debt" was nonetheless held to be indeterminate because of the ongoing bankruptcy proceedings. Similarly, although Stochastic has obtained judgments for specific amounts, the amount of its "lost debt" cannot be determined at this time because of the ongoing efforts to collect those judgments. As Bankers Trust recognized, a debt is "lost" and thereby becomes a basis for RICO trebling only if the debt (1) cannot be collected (2) "by reason of" a RICO violation. See § 1964(c).
 
 
 35
 As stated earlier, the full amount of the judgment in the Insurance Case has now been paid to Stochastic. Nor can the judgment in the Guarantee Case, obtained after the initiation of the instant action, be regarded as "lost debt." The district court has provided equitable relief in this case both pendente lite and in the final judgment to assure payment of the judgment in favor of Stochastic, which includes the full amount of the judgment in the Guarantee Case. It accordingly appears that Stochastic's judgment in the Guarantee Case is likely to be fully satisfied, and the judgment cannot be regarded at this time as "lost debt." In the event, however, that Stochastic should ultimately fail to collect the judgment in the Guarantee Case, it may then have a RICO claim as the basis for a separate action. See Bankers Trust, 859 F.2d at 1106.
 
 
 36
 Stochastic asserts that permitting a defendant to avoid treble damages by paying compensatory damages prior to entry of the judgment vitiates the remedial nature of RICO. Stochastic cites several RICO and antitrust cases in support of this claim. See Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114 (D.C.Cir.) (RICO action), cert. denied, --- U.S. ----, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991); Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.) (antitrust action), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig., 636 F.Supp. 1138 (C.D.Cal.1986) (RICO action); Pennsylvania v. Cianfrani, 600 F.Supp. 1364 (E.D.Pa.1985) (RICO action); see also Liquid Air Corp. v. Rogers, 834 F.2d 1297 (7th Cir.1987) (RICO action), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).
 
 
 37
 We do not find these cases persuasive on the facts presented here. Pyramid stated, in the course of affirming a summary judgment dismissal of a RICO claim, a one-sentence footnote dictum, citing Liquid Air, that under RICO it "appears" that the proceeds of prior judgments are to be set off against a recovery only after the damages are trebled. 924 F.2d at 1117 n. 3. Liquid Air involved an effort to return fraudulently converted gas cylinders after the entry of a RICO judgment that trebled the damages resulting from that conversion. 834 F.2d at 1310.
 
 
 38
 In Flintkote, third parties made a pretrial settlement with the plaintiff that was allowed to offset the subsequent antitrust judgment against the defendant only after trebling. 246 F.2d at 397-98. National Mortgage applied this antitrust rule in the RICO context against a defendant who sought the benefit of another party's pretrial settlement. 636 F.Supp. at 1151. Cianfrani involved a withholding from retirement funds payable to a retired legislator of amounts equal to funds that he had embezzled by placing fictitious employees on the legislative payroll; the withholding was held not to bar a subsequent RICO award of treble damages (reduced by the prior withholding) in behalf of the state against the legislator. 600 F.Supp. at 1367.
 
 
 39
 None of these cases involved, as did Bankers Trust, a RICO violation whose central purpose was to prevent the collection of a claim or judgment. Accordingly, they do not provide reliable guidance for the resolution of the "lost debt" issue presented by this appeal. Bankers Trust makes clear that such a RICO claim does not accrue until it is established that collection of the claim or judgment has been successfully frustrated. In other words, to the extent of a successful collection, the RICO claim is abated pro tanto, prior to any application of trebling.
 
 
 40
 2. Attorney Fees as RICO Damages.
 
 
 41
 Stochastic contends that Bankers Trust "makes it clear that plaintiff is ... entitled to recover as [trebled] RICO damages the ... legal fees which plaintiff incurred in obtaining the two New Jersey judgments.... [Bankers Trust, 859 F.2d at 1105.]" We disagree. Stochastic's argument would be equivalent to a ruling in Bankers Trust that the attorney fees incurred by the bank during the debtor's initial bankruptcy proceedings constituted RICO injury. However, Bankers Trust sought only past legal fees incurred in (1) fighting the debtor's frivolous satellite lawsuits; (2) overcoming bribe-induced decisions in South Carolina; and (3) obtaining a revocation of the initial reorganization plan. 859 F.2d at 1105. We allowed recovery of such fees, to the extent not barred by the statute of limitations. Id.
 
 
 42
 This ruling provides no basis to allow Stochastic to recover the legal fees initially expended in obtaining the New Jersey judgments. The asserted RICO violations in this case are defendants' illegal actions in impeding Stochastic's collection of those judgments. The Supreme Court has made it clear that a RICO injury must stem from and be proximately caused by a RICO violation. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496-97, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) ("plaintiff ... can only recover to the extent that ... he has been injured in his business or property by the conduct constituting the violation " (emphasis added)); see also Holmes v. Securities Investor Protection Corp., --- U.S. ----, ----, ----, 112 S.Ct. 1311, 1318-21, 117 L.Ed.2d 532 (1992) (articulating proximate cause requirement for RICO). In the instant case, it cannot plausibly be contended that efforts to impede the collection of the New Jersey judgments proximately caused Stochastic's prior expenditure of legal fees in obtaining the judgments. Additionally, we perceive no abuse of discretion by the district court in reducing the legal fees claimed by Stochastic to have been spent in its collection efforts from $71,976.26 to $50,000.
 
 
 43
 Cross-Appellants contest the district court's allowance of that $50,000 (trebled to $150,000) as RICO damages. Relying primarily upon Capasso v. Cigna Ins. Co., 765 F.Supp. 839, 842-43 (S.D.N.Y.1991), they argue that the attorney fees cannot be RICO damages because they were only incidental and indirect consequences of any RICO violations in this case. The most pertinent language from Capasso is the following:
 
 
 44
 The defendants point out that attorneys' fees and costs of investigation incurred as a result of defendants' allegedly illegal acts do not qualify as RICO injuries. See, e.g., Local 335, Hotel, Motel, etc. v. Pier 66 Co., 599 F.Supp. 761, 765 (S.D.Fla.1984); Rylewicz v. Beaton Services, Ltd., 698 F.Supp. 1391, 1395-6 (N.D.Ill.1988), aff'd, 888 F.2d 1175 (7th Cir.1989).
 
 
 45
 * * * * * *
 
 
 46
 Here, it cannot reasonably be suggested that the harm contemplated by the alleged fraudulent scheme was an increase in [plaintiff's] attorneys' fees.
 
 
 47
 765 F.Supp. at 842.
 
 
 48
 The district court in Capasso immediately proceeded to point out, however, that no predicate RICO act of mail or wire fraud had been established, and to cite cases in which litigation expenses in a prior litigation were allowed as RICO damages when a RICO violation was proved. Id. at 842-43. Further, as discussed supra herein, we explicitly ruled in Bankers Trust that legal fees may constitute RICO damages when they are proximately caused by a RICO violation. See Bankers Trust, 859 F.2d at 1105. We accordingly reject Cross-Appellants' contention that the district court improperly allowed the $50,000 legal fees expended by Stochastic in collecting the New Jersey judgments as (trebled) RICO damages.
 
 
 49
 B. The Determination of Stochastic's § 1964(c) Attorney Fee.
 
 
 50
 Section 1964(c) mandates the recovery of "threefold the damages" sustained as a result of a RICO violation; Stochastic was awarded $150,000 for the (trebled) fees expended in collecting the New Jersey judgment pursuant to this provision. Section 1964(c) also requires a RICO plaintiff to be awarded "the cost of the [RICO] suit, including a reasonable attorney's fee." As described supra, Stochastic claimed an attorney's fee of $497,477.24. The district court disallowed $80,000 for "unreasonably excessive litigation," allocated $100,000 to Stochastic's pursuit of its state law claims, and awarded a fee of $317,477.24.
 
 
 51
 Stochastic contends that the district court erred in disallowing $80,000 of its legal fees.[4] Cross-Appellants maintain, on the other hand, that the district court "fail[ed] to recognize that ... it ... had discretion ... to reduce the RICO fee award more drastically."
 
 
 52
 The district court's determination of the amount of attorney fees will be reversed only if the court abused its discretion. Pierce v. Underwood, 487 U.S. 552, 571, 108 S.Ct. 2541, 2553, 101 L.Ed.2d 490 (1988); Cassuto v. Commissioner, 936 F.2d 736, 740 (2d Cir.1991). Judge Weinstein presided over the twelve-day trial of this case and the related proceedings, and thus was in a superior position to determine the reasonableness of attorney fees. He explicitly disallowed those fees that he found to result from "unreasonably excessive" litigation, and granted only fees that were deemed an "entirely reasonable sum given the difficulty of this kind of litigation." Furthermore, he appropriately determined the portion of Stochastic's fees that was not related to the RICO claim, but rather was allocable to litigating the state law claims. See supra note 4.
 
 
 53
 Stochastic's argument consists of blanket assertions that these determinations "were not based on any evidence whatsoever," and that it is entitled to "its full legal fees in this action." These claims are insufficient to disturb the district court's conclusion that the amount it awarded constituted a "reasonable attorney's fee" within the meaning of § 1964(c).
 
 
 54
 Cross-Appellants contend that the district court did not make an adequate determination of reasonableness, as required by Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). See also Farrar v. Hobby, --- U.S. ----, ----, 113 S.Ct. 566, 574, 121 L.Ed.2d 494 (1992) (" 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained' ") (quoting Hensley, 461 U.S. at 436, 103 S.Ct. at 1941). Specifically, they assert that the court made only a "cursory lodestar calculation," and did not "complete the process by evaluating the reasonableness of the fees in comparison to the 'results obtained.' " On the contrary, the district court properly concluded that Stochastic had prevailed in proving its RICO claim against many of the defendants.
 
 
 55
 Further, both Hensley and Farrar construed 42 U.S.C. § 1988, which provides that in certain civil rights actions, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee...." 42 U.S.C.A. § 1988(b) (West Supp.1992) (emphasis added). We noted in United States Football League v. National Football League, 887 F.2d 408, 412 (2d Cir.1989), cert. denied, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990), that Hensley analysis "is of limited applicability" to statutes that mandate an award of attorney fees. United States Football League construed the fee provision of the Clayton Act, 15 U.S.C. § 15(a) (1988), which is virtually identical to the mandatory fee provision of § 1964(c). See also Holmes, --- U.S. at ----, 112 S.Ct. at 1317 ("Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws, § 4 of the Clayton Act [15 U.S.C. § 15 (1988) ]....").
 
 
 56
 We accordingly affirm the district court's allowance of a $317,477.24 attorney fee to Stochastic.
 
 
 57
 B. Dismissal Against Lucille Wagner, DiMaio, Gluck, and Berke.
 
 
 58
 The district court ruled that Lucille Wagner, DiMaio, Gluck, and Berke were not liable to Stochastic. On appeal, Stochastic contends that all these parties should have been held to be liable to Stochastic as RICO conspirators.
 
 
 59
 1. Lucille Wagner.
 
 
 60
 Stochastic's amended complaint alleges no facts that implicate Lucille Wagner as a participant in the RICO violations. The complaint only identifies her as Arthur Wagner's wife, and then encompasses her in a general charge that "[a]ll of the defendants, directed by Wagner," engaged in RICO violations.
 
 
 61
 "[T]he bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts." McLaughlin v. Anderson, 962 F.2d 187, 192 (2d Cir.1992) (citing H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989); Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14). The evidence adduced at trial concerning Lucille Wagner was inconclusive at best. There was proof that she was paid a $15,000 annual wage by Wagner McNiff during 1986 and 1987, but she denied ever working for the firm. Additionally, during 1987 and 1988, a number of checks from Paradise Properties, an entity that was a vehicle for the receipt of fraudulent transfers in pursuance of the RICO scheme, were made payable to Lucille Wagner, but she denied ever receiving any money from Paradise Properties. The district court was certainly free to consider this proof to be inadequate to establish liability of Lucille Wagner to Stochastic.
 
 
 62
 2. DiMaio.
 
 
 63
 Stochastic also argues that the district court erred in not holding DiMaio liable as a RICO conspirator. This argument is irrelevant, because DiMaio was not named as a defendant. See supra note 2. The alleged partnership, Wagner McNiff, was named as a defendant, however, and judgment was entered against the partnership. Accordingly, all of the assets of the partnership, but none of DiMaio's nonpartnership assets, are subject to the judgment. See N.Y.Civ.Prac.L. & R. 5201(b) cmt. 5201:17 (McKinney 1978).
 
 
 64
 If DiMaio advanced personal funds to the partnership, some issue as to the amenability of those funds to the judgment in this action might conceivably turn on whether they constituted a capital account of a partner or some other form of advance. In any event, no such issue is presented on this appeal.
 
 
 65
 We add that in our view, contrary to the conclusion of the district court, DiMaio was a partner in the law firm. DiMaio and Wagner worked under the firm name Wagner, McNiff & DiMaio for over thirty years. They shared office space, a secretary, a letterhead indicating that the firm was a partnership, and three bank accounts under the name Wagner, McNiff & DiMaio. Both lawyers signed a partnership certificate for Marine Midland Bank when they opened one of the accounts which stated that they were general partners of the firm, and that "each general partner has full authority to represent and sign for the firm in all respects." Both Wagner and DiMaio were listed as members of the firm in Martindale-Hubbell. Further, they assisted each other in performing work for clients brought in by the other when needed, as in the case of the DiDomenicos. When DiMaio did work for Wagner's clients, they would frequently work out some type of revenue-sharing arrangement.
 
 
 66
 Stochastic also asserts that DiMaio is liable to Stochastic as a partner by estoppel in accordance with section 27 of the Uniform Partnership Act as enacted in New York. See N.Y. Partnership Law § 27 (McKinney 1988). This argument is specious. The statute provides that a person who is deemed a partner by estoppel "is liable to any such person to whom [a representation of partner status] has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership...." Id. § 27(1) (emphasis added). Stochastic only claims that DiMaio made such representations throughout the existence of the alleged conspiracy. Whether or not this is so, Stochastic does not even assert the further statutory predicate for relief, to wit, that Stochastic gave "credit" to Wagner McNiff on the basis of such representations.
 
 
 67
 3. Gluck.
 
 
 68
 Stochastic also claims that the district court should not have dismissed the RICO complaint against Gluck. Only the most tenuous claims are advanced concerning Gluck's involvement in the transactions at issue in this case, however, and there is no challenge to the assertion that Gluck was not even aware of the mortgage on the Vacant Land arranged by Wagner, with Gluck as mortgagee, until shortly before a Gluck representative was deposed in this case. The district court was certainly justified in concluding that Gluck was not a knowing participant in the RICO conspiracy.
 
 
 69
 4. Berke.
 
 
 70
 Stochastic contends that the New Jersey judgment in the Berke foreclosure action should have been binding on the district court as to Berke's liability, in accordance with the doctrine of collateral estoppel. This doctrine applies if "an issue tendered for resolution in a later litigation has been finally determined in a prior adjudication after a full and fair opportunity for litigation in which the issue was actually litigated and necessary to the prior decision." Laaman v. United States, 973 F.2d 107, 112 (2d Cir.1992) (collecting cases), cert. denied, --- U.S. ----, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).
 
 
 71
 Stochastic's submissions to this court contradict its issue preclusion argument. In its reply brief (addressing the issue of claim preclusion), Stochastic states that "the factual predicate underlying this [RICO] action, and the evidence required to prove the claims in this action, are entirely different from the discrete contract and fraud issues involved in ... the Berke Foreclosure action."
 
 
 72
 In any event, all of the elements required to impose RICO liability upon Berke were not necessarily determined in the New Jersey foreclosure action. The district court expressly found that the RICO enterprise was operated with Berke "ha[ving] no understanding of how [he was] being used." Further, the New Jersey court's determination that Berke collaborated in an effort, violative of state law, to effectuate a fraudulent conveyance does not necessarily establish knowing participation in the commission of RICO predicate acts that establish a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c) (1988), thus providing a basis for liability under § 1964(c). See Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139 (5th Cir.1992) (collecting cases).
 
 
 73
 The issue might be closer with respect to the district court's determination that Berke was not liable on Stochastic's state law claims, but Stochastic contends on appeal only that Berke should have been held liable as a RICO conspirator. We perceive no reversible error in the district court's contrary determination.
 
 
 74
 C. The New Jersey "Entire Controversy" Doctrine.
 
 
 75
 Cross-appellants assert that Stochastic's RICO claim is barred by New Jersey's "entire controversy" doctrine. We are required by 28 U.S.C. § 1738 (1988) to accord the pertinent New Jersey proceedings (i.e., the Insurance Case, the Guarantee Case, and the Foreclosure Case ) "the same full faith and credit ... as they have by law or usage in the courts of" New Jersey. See Kremer v. Chemical Constr. Corp., 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982) (federal courts must give state court judgments same preclusive effect they would have in issuing state); see also U.S. Const., art. IV, § 1 (imposing similar obligation upon state courts).
 
 The New Jersey entire controversy doctrine
 
 76
 is a preclusionary principle intended to prevent the fractionalization of litigation by requiring all claims between the same parties arising out of or relating to the same transactional circumstances to be joined in a single action. The effect of the doctrine is to preclude a party from withholding from the action for separate and later litigation a constituent component of the controversy even where that component is a separate and independently cognizable cause of action.
 
 
 77
 Brown v. Brown, 208 N.J.Super. 372, 506 A.2d 29, 32 (App.Div.1986) (collecting cases); see also Cogdell v. Hospital Ctr., 116 N.J. 7, 560 A.2d 1169, 1172-74 (1989). The Third Circuit has noted that the New Jersey doctrine "reaches more broadly than the 'same cause of action' requirement of traditional res judicata doctrine." Melikian v. Corradetti, 791 F.2d 274, 279 (3d Cir.1986); see also Kozyra v. Allen, 973 F.2d 1110, 1111 (3d Cir.1992); Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 112-13 (3d Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989). The doctrine precludes all claims arising out of the same controversy that could have been raised in the earlier action, including those involving different legal theories or requesting alternative relief. See Melikian, 791 F.2d at 279; see also N.J.Ct.R. 4:27-1 cmt. 3 (Jan. 2, 1989).
 
 
 78
 The New Jersey Supreme Court has stated that:
 
 
 79
 The purposes of the [entire controversy] doctrine include the needs of economy and the avoidance of waste, efficiency and the reduction of delay, fairness to parties, and the need for complete and final disposition through the avoidance of "piecemeal decisions." 2 State of New Jersey Constitutional Convention of 1947, Committee on the Judiciary Report § II(J), at 1187 (1947). The entire controversy doctrine has evolved "to eliminate delay, prevent harassment of a party and unnecessary clogging of the judicial system, avoid wasting the time and effort of the parties, and promote fundamental fairness." See Barres v. Holt, Rinehart and Winston, Inc., 74 N.J. 461, 465, 378 A.2d 1148 (1977) (Schreiber, J., dissenting).
 
 
 80
 Cogdell, 560 A.2d at 1173.
 
 
 81
 In this case, the district court concluded that the entire controversy doctrine did not bar the assertion of Stochastic's claims. No underlying rationale was articulated, but some colloquy indicates that the court relied upon the fact that Stochastic was asserting RICO claims in this action.
 
 
 82
 This does not appear to be an adequate basis to shield Stochastic from the application of the New Jersey doctrine. In Printing Mart-Morristown, Inc. v. Rosenthal, 650 F.Supp. 1444 (D.N.J.), appeal dismissed mem., 833 F.2d 306 (3d Cir.1987), aff'd mem., 856 F.2d 184 (3d Cir.1988), it was held, applying the entire controversy doctrine, that a subsequent federal RICO action was barred by a prior state court action arising from the same transaction, see id. at 1447-52, even though it had not then been definitively determined that state courts have concurrent jurisdiction over federal civil RICO actions.[5] Given the unsettled state of the (since resolved) concurrent jurisdiction issue, the court ruled that the plaintiff was obliged to tender the RICO issue to the state court, rather than make a unilateral decision against concurrent jurisdiction and in favor of subsequent federal litigation. See id. at 1449-50.
 
 
 83
 In any event, as will appear, we find other grounds for nonapplication of the entire controversy doctrine in this case, and it is axiomatic that "we may affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S, 943 F.2d 220, 223 (2d Cir.1991) (collecting cases).
 
 
 84
 As indicated supra, the entire controversy doctrine requires "all claims between the same parties arising out of or relating to the same transactional circumstances to be joined in a single action." Brown, 506 A.2d at 32. The "transactional circumstances" of the instant case involve a fraudulent scheme to prevent the collection of the judgments in favor of Stochastic in the Insurance Case and the Guarantee Case. Most of this activity occurred after the entry of the judgment in the Insurance Case, so it cannot plausibly be claimed that the claims presented in the instant litigation should have been brought in the Insurance Case. The "transactional circumstances" of the Guarantee Case involved a simple claim that Anthony and Carol were liable, as guarantors, on amounts owing under a defaulted lease of school buses by Eagle from Stochastic. Even though the entire controversy doctrine requires the presentation of related claims arising after the inception of litigation to the court for its determination as to their inclusion in the pending litigation, see Brown, 506 A.2d at 34, it takes a considerable leap to conclude that the widely ramified scheme to thwart Stochastic's collection of any and all amounts owed to it by the DiDomenico interests should be regarded as having a close transactional relationship to the much simpler matter of the guarantees owed on the defaulted bus lease.
 
 
 85
 Furthermore, a contrary ruling would probably inure only to the benefit of Anthony and Carol, the only named defendants in the Guarantee Case, who may be practically judgment proof at this juncture as a result of the machinations that are the subject of the instant litigation. Mandatory joinder of parties was relatively limited in New Jersey practice prior to the Cogdell decision in 1989. See Cogdell, 560 A.2d at 1171-74. It was only established in Cogdell that "the entire controversy doctrine appropriately encompasses the mandatory joinder of parties," id. at 1178, as well as claims, and this ruling was made applicable only prospectively as of July 24, 1989, id. at 1179, at which time final judgments in favor of Stochastic had been entered in both the Insurance Case and the Guarantee Case.
 
 
 86
 We recall at this juncture our ruling supra that Stochastic may ultimately have a claim for lost debt against one or more of the defendants in this action, but any such claim has not yet accrued. Obviously, Stochastic cannot be faulted for its failure to assert a claim that still has not accrued in the prior New Jersey litigation. See Printing Mart-Morristown, 650 F.Supp. at 1449 (a prior judgment " 'cannot be given the effect of extinguishing claims which did not ... exist and which could not possibly have been sued upon in the previous case' ") (quoting Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 328, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955)).
 
 
 87
 Finally, as to the Foreclosure Case, Stochastic asserts without contradiction that it was not served as a defendant with the amended complaint in that case until after the initiation of the instant litigation. Thus, there can be no serious claim that the opportunity to assert counterclaims in the Foreclosure Case precluded the assertion of any claims by Stochastic herein.
 
 
 88
 For all the foregoing reasons, we affirm the ruling of the district court that the assertion of Stochastic's claims in this case was not barred by the New Jersey entire controversy doctrine.
 
 
 89
 D. Wagner's Liability for the Fraud Counts.
 
 
 90
 Wagner contends that the district court incorrectly found him liable on Stochastic's fraudulent conveyance and common law fraud claims. Wagner concedes in his main appeal brief, however, that transfers were made "in reaction to a New Jersey judgment about to be entered, or [that] had been entered against James, DCJM and Carol Coaches; James was the legal owner of the assets in question and the intent was to disguise his continued ownership." Further, the district court explicitly found that Wagner masterminded these fraudulent transfers, used some of the transferred assets to pay his legal fees and personal expenses, and intended ultimately to cheat the DiDomenicos out of the Vacant Land for his personal benefit.
 
 
 91
 The New York Court of Appeals has made it clear that the pertinent provisions of the New York Debtor and Creditor Law provide a creditor's remedy for money damages against parties who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance. See FDIC v. Porco, 75 N.Y.2d 840, 842, 552 N.E.2d 158, 159-60, 552 N.Y.S.2d 910, 911-12 (1990) (per curiam). It follows that Wagner was properly held liable on the fraudulent conveyance claim.
 
 
 92
 Wagner's liability for common law fraud is also amply sustained by this record. We note that the district court allowed this claim only as an alternative to the recovery on the fraudulent conveyance claim. Further, if Stochastic recovers the judgment in the Guarantee Case independently in the New Jersey proceedings, the "one satisfaction" rule will preclude any recovery thereon as a component of the fraudulent conveyance claim, or the totality of the common law fraud claim, in this case. See Phelan v. Local 305 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus., 973 F.2d 1050, 1063 (2d Cir.1992) ("A plaintiff may not recover twice for the same injury.") (collecting cases), petition for cert. filed, --- U.S. ----, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).
 
 Conclusion
 
 93
 The final judgment and supplemental final judgment of the district court are affirmed. Stochastic's motion to strike the second supplemental appendix is denied. Cross-Appellants' application to suppress Stochastic's reply brief is denied. The parties shall bear their own costs.
 
 
 
 [1]
 A notice of appeal was filed by Kingsbury, No. 92-7385, but that appeal was subsequently defaulted and dismissed
 
 
 [2]
 Stochastic also contends on appeal that the district court should have held Thomas DiMaio liable as a RICO conspirator on the basis of alleged membership in Wagner McNiff, asserted to be a law partnership. DiMaio was not named individually as a defendant
 
 
 [3]
 It is unclear why a cross-appeal was filed on behalf of Lucille Wagner, Gluck, and Berke, since the district court dismissed the complaint against them with prejudice. No brief was filed or oral argument made on this appeal in behalf of the DiDomenicos and their related companies (DCJM, Carol Coaches, JD Enterprises, and Southgate), who filed a letter joining in those arguments of their fellow Cross-Appellants which were not inconsistent with the interests of the DiDomenicos
 
 
 [4]
 $100,000 of Stochastic's claimed RICO legal fee was allocated to the fraudulent conveyance claim, but recovery of that $100,000 was allowed pursuant to N.Y.Debt. & Cred.Law § 276-a (McKinney 1990). The allocation thus did not harm Stochastic
 
 
 [5]
 Such a definitive determination was subsequently made, prior to the ruling of the district court in the instant case. See Tafflin v. Levitt, 493 U.S. 455, 458-59, 110 S.Ct. 792, 793-95, 107 L.Ed.2d 887 (1990)