**STOCHASTIC DECISIONS, INC.,**
Plaintiff–Appellee–Cross–
Appellant,

v.

Arthur **WAGNER** and Wagner, McNiff
& DiMaio, Defendants–Appellants–
Cross–Appellees,

Kingsbury–Putney, Inc., Geoffrey Ashby,
Thomas Miral, James DiDomenico, An-
thony DiDomenico, Carol DiDomenico,
DCJM Realty Corp., Carol Coaches, Inc.,
J.D. Enterprises, Inc., Southgate Bus
Service, Lucille Wagner, T. Gluck & Co.,
Inc. and Michael Berke, Defendants.

Nos. 1721, 1847, Dockets 93–9109, 93–9203.

United States Court of Appeals,
Second Circuit.

Argued June 20, 1994.

Decided Sept. 1, 1994.

Barry A. Tessler, New York City (Michael R. Perle and Hayden, Perle & Sibler, Weehawken, NJ, of counsel), for defendants-appellants-cross-appellees.

Helen Davis Chaitman (Jody B. Keltz and Ross & Hardies, New York City, of counsel), for plaintiff-appellee-cross-appellant.

Before: WINTER, MINER and MAHONEY, Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants-cross-appellees Arthur Wagner and Wagner, McNiff & DiMaio (collectively "Wagner") appeal, and plaintiff-appellee-cross-appellant Stochastic Decisions, Inc. cross appeals, from a September 28, 1993 order of the United States District Court for the Eastern District of New York (Nickerson, J.) directing the entry of a deficiency judgment of $376,687.19 in favor of Stochastic. In partial satisfaction of its judgment against the defendants in this case, Stochastic had been granted the right to foreclose a mortgage held by defendant Kingsbury–Putney, Inc. ("KPI") on a vacant parcel of real property located in Staten Island, New York. Stochastic was the high bidder at the foreclosure sale. After allowing for open real estate taxes on the property, costs of the sale, and a senior mortgage, the district court calculated the deficiency judgment by crediting against the outstanding judgment the fair market value of the vacant land, rather than the lower amount Stochastic bid at the foreclosure sale. We conclude that the district court should have calculated the deficiency judgment on the basis of the actual bid and that the court erred in apportioning responsibility for the real estate taxes. We therefore remand to the district court for revision of the order directing entry of the deficiency judgment in accordance with the discussion that follows.

Wagner also appeals from a January 5, 1994 order of the district court directing the turnover to Stochastic of accounts belonging to Wagner and his wife Lucille and funded pursuant to a profit sharing plan, which included Wagner, Lucille and Wagner's secretary as beneficiaries. The district court rejected Wagner's argument that the funds in the profit sharing plan were protected by N.Y.Civ.Proc.L. & R. ("CPLR") § 5205(c) (McKinney's 1978 & Supp.1994), which exempts from application to the satisfaction of

money judgments certain trusts qualified under section 401 of the Internal Revenue Code, 26 U.S.C. § 401(l) (1988 & Supp. V 1994), finding that the profit sharing plan was not qualified because it included Lucille, who was not a bona fide employee of Wagner, as a beneficiary. We affirm the district court's order directing the turnover of the profit sharing accounts.

## BACKGROUND

This appeal concerns efforts by Stochastic to enforce a civil judgment it obtained in the district court on its RICO and state-law fraud and fraudulent conveyance claims ("RICO Judgment"). On November 18, 1991, after a bench trial before District Judge Weinstein, Stochastic was awarded a $1,157,407.94 judgment against Arthur Wagner, his law firm, Wagner, McNiff & DiMaio, defendants Anthony, James and Carol DiDomenico and several corporations controlled by the DiDomenicos. The district court found, inter alia, that Arthur Wagner and his firm, as attorneys for the DiDomenicos, had devised a scheme to convey assets of the DiDomenicos fraudulently in order to block Stochastic's attempts to collect on certain state-court judgments. The judgment of the district court was affirmed by this Court. *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158 (2d Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993).

### The Vacant Land

At issue in the proceedings leading to the district court's September 28 order was a fifteen-acre parcel of vacant land ("Vacant Land") previously owned by a company controlled by the DiDomenicos. The property was being levied upon by Stochastic to satisfy a New Jersey state court judgment it held against James DiDomenico. Before the levy was perfected, the land was fraudulently transferred to KPI, a shell corporation formed by Wagner. KPI was named as a defendant in the RICO action. In September of 1989, while the action in the district court was pending, KPI sold the land to Ghazi Bokhari for $2.8 million and took back two purchase-money mortgages in the total amount of $2.2 million. At the time of this sale, the property was subject to a mortgage in the amount of $115,000 held by the City of New York.

Bokhari subsequently defaulted on the senior KPI mortgage, and KPI initiated foreclosure proceedings in New York Supreme Court, Richmond County. The foreclosure action was near judgment when the district court entered the RICO Judgment. The RICO Judgment included the following provisions:

> The existing mortgages of [KPI] in the respective amounts of $650,000 and $1,635,000 shall be deemed restructured so that plaintiff Stochastic shall have all of the rights of [KPI] with respect to those mortgages until the judgment with interest to date of payment is satisfied. The [KPI] mortgages are reduced by the amount of $1,157,407.94, the prior lien now granted to plaintiff. This reduction is required so that the present owner's equity is not reduced.

> ... [KPI] is enjoined from taking any further action in the foreclosure action entitled *Kingsbury–Putney, Inc. v. Stephen Pearlman, As Exchange Trustee for Ghazi Bokhari and Ghazi Bokhari et. al.,* Index No. 1039/91, pending in the Supreme Court of New York, Richmond County until plaintiff's judgment is satisfied. Plaintiff is authorized to continue the foreclosure action and to exercise all of [KPI's] rights under the mortgages until plaintiff's judgment with interest to date of payment is paid in full.

Stochastic completed the foreclosure action, and a referee's sale was scheduled for January 15, 1993.

At the sale, parties aligned with Wagner bid $650,000, parties aligned with Bokhari bid $1,170,000 and Stochastic was the high bidder with a bid of $1,205,000. The open real estate taxes on the property were approximately $400,000, including interest. Closing was scheduled for February 16, 1993, unless the referee extended the closing time.

Rather than close the sale on February 16, Stochastic filed a motion in the district court on that date to determine the amount remaining due on the RICO Judgment once the sale was closed. Stochastic claimed the out-

standing balance on the RICO Judgment was $1,090,308.49, plus interest of $55,558.56 through April 1, 1993. Wagner cross-moved, seeking, inter alia, an order declaring the judgment fully satisfied by the proceeds of the foreclosure sale pursuant to the market-value credit provided in N.Y. Real Prop. Acts & Proc.Law ("RPAPL") § 1371(2) (McKinney 1979). He asserted that under RPAPL § 1371, or alternatively CPLR § 5240 (McKinney 1978), the credit against the RICO Judgment should be calculated on the basis of the higher of the bid price, $1,205,-000, or the fair and reasonable market value of the property. After a hearing, Judge Weinstein entered an order determining the market value of the property to be $1,311,-000. He later vacated this order and recused himself without explanation. The case was reassigned to District Judge Nickerson, who referred it to Magistrate Judge Caden for a valuation hearing.

At the hearing, the parties presented conflicting expert testimony regarding the market value of the property. Accepting the estimate of Stochastic's expert in his report and recommendation, Magistrate Judge Caden determined the market value of the property to be $1,311,000. To ascertain the deficiency judgment, Magistrate Judge Caden first calculated the outstanding balance of the RICO Judgment, plus interest through January 15, 1993, the date of the sale, to be $1,137,533.27. He credited against this amount the fair market value of the Vacant Land, $1,311,000, less the outstanding mortgage held by the City, $115,000; the open real estate taxes on the property plus interest, which he found to be $432,598.57; the receiver's fee of $200; and advertising costs of $2,355.35. The deficiency was $376,687.19. In a September 28, 1993 order, the district court adopted the Magistrate Judge's recommendation and awarded Stochastic a deficiency judgment of $376,687.19. Stochastic finally closed the sale of the Vacant Land on September 15, 1993.

*The Profit Sharing Plan*

At issue in the proceedings leading to the district court's January 5, 1994 order was Stochastic's efforts to obtain funds in a profit sharing plan Wagner maintained at Gruntal & Co. for the benefit of himself, his wife, Lucille, and his secretary, Connie Lee. Wagner started the plan in the 1970s as a Keogh retirement plan and began making contributions for Lee in the mid or late 1980s. Beginning in 1987, for the tax years 1986 through 1990, contributions were made for Lucille. As of December of 1991, there was over $250,000 in the plan.

On November 19, 1991, the day after the RICO Judgment was entered, Stochastic served Wagner with a restraining notice, which froze his assets. In need of cash, Wagner contacted Gruntal and asked if he could borrow against the profit sharing plan. He was informed that he could not, but that he could close out the accounts. Thereafter, Wagner, Lucille and Lee each instructed Gruntal to liquidate their accounts. Gruntal issued three checks: one for $195,079.64, payable to Wagner; one for $46,668.22, payable to Lee; and one for $14,228.18, payable to Lucille.

Lee and Lucille rolled the proceeds from their accounts over into Individual Retirement Accounts. Wagner endorsed his check to a friend, Alan Dern, who deposited it in an account maintained by Dern at Barclays Bank in Bayside, Queens. Dern then withdrew all of his own funds from the account and provided Wagner with signed checks, which Wagner used to disburse all of the remaining funds over a period of three weeks. Wagner testified that he used Dern's account, rather than one of his own, because he did not want Stochastic to levy upon the money.

After withdrawing the money from the plan, Wagner apparently learned from his tax advisor that the withdrawal would have costly tax consequences. In a December 24, 1991 letter to Gruntal, Wagner therefore sought to reestablish the entire profit sharing plan. By the end of December, the money withdrawn from the plan was returned to Gruntal and the three accounts reestablished.

On August 11, 1993, Stochastic moved in the district court for an order directing the turnover of the funds in the plan. The matter was referred to Magistrate Judge Caden for a hearing. In opposition to the motion,

Wagner asserted that the funds were protected by CPLR § 5205(c), which exempts certain trusts, including retirement plans qualified under section 401 of the Internal Revenue Code, from being applied to the satisfaction of money judgments. Stochastic contended that the plan was not qualified because a qualified plan may only include employees as beneficiaries and that Lucille was not a bona fide employee of Wagner. To prove Lucille was a bona fide employee, Wagner introduced in evidence a W–2 form from 1988 indicating that he had paid Lucille a salary of $15,000 for the year. He also introduced four paychecks showing that she had been paid her entire 1988 salary over three weeks in September of 1988 and that in 1989 she had received one-third of her salary in September and another third in December.

Wagner testified that Lucille had worked for the firm since 1958 but had not been treated as an employee until much later. Lucille testified that she was an employee of the firm since 1957, although she testified at a deposition during the discovery phase of the RICO litigation that she had not worked since her marriage in 1957. To explain her contradictory testimony, she asserted that she had "misunderstood" her employment status.

In a report and recommendation dated December 7, 1993, Magistrate Judge Caden concluded that the plan was not qualified under section 401 because it included Lucille, who was not a bona fide employee. Since the plan was not qualified, it was not protected by CPLR § 5205(c). The Magistrate Judge further concluded that Wagner's parking of his share of the money in Dern's account was a fraudulent conveyance because it was an attempt to frustrate Stochastic's effort to enforce its judgment. Accordingly, he recommended that Wagner's account be turned over to Stochastic. He also concluded that Lucille's account had been opened and funded on behalf of a fictitious employee and actually was the property of the employer, Wagner. Accordingly, he recommended that Lucille's share be subject to levy by Stochastic. In a January 5, 1994 order, the district court adopted the report and recommendation.

## DISCUSSION

### 1. Deficiency Judgment

On appeal, Wagner argues that the district court erred in determining the market value of the Vacant Land. Stochastic counters that the market value of the land is irrelevant because a market-value credit should not have been applied in determining the deficiency judgment. Because we agree with Stochastic on this point, we need not consider whether the market value of the land was calculated properly. Both parties contend that the district court erred in apportioning responsibility for the real estate taxes for the transaction. We modify the apportionment.

### a. Market–Value Credit

RPAPL § 1371 governs deficiency judgments where a mortgagee forecloses on property and joins the mortgagor as a party defendant. Subsection two of the statute provides in part:

> Such deficiency judgment shall be for an amount equal to the sum of the amount owing by the party liable as determined by the judgment with interest, plus the amount owing on all prior liens and encumbrances with interest, plus costs and disbursements of the action including the referee's fee and disbursements, *less the market value as determined by the court or the sale price of the property whichever shall be the higher.*

(emphasis added).

The predecessor to section 1371(2) was enacted as emergency legislation during the Great Depression, when the market for real estate had virtually disappeared. 1933 N.Y.Laws ch. 794; *see Sanders v. Palmer*, 68 N.Y.2d 180, 183–85, 507 N.Y.S.2d 844, 499 N.E.2d 1242 (1986). Foreclosing mortgagees had been able to purchase real property at nominal cost at a sheriff's sale and then obtain a deficiency judgment against the mortgagor with only a small adjustment of the debt. *See Wandschneider v. Bekeny*, 75 Misc.2d 32, 346 N.Y.S.2d 925, 929–30 (1973). By providing for a market-value credit against the mortgage debt, section 1371(2)

was intended to prevent the "then existing inequity of 'a double recovery for one debt.'" *Id.* 346 N.Y.S.2d at 930 (quoting *Weisel v. Hagdahl Realty Co.,* 241 A.D. 314, 271 N.Y.S. 629, 631 (1934)). Section 5240 of the CPLR gives the courts "discretionary power to control and regulate the enforcement of a money judgment … to prevent 'unreasonable … prejudice to any person or the courts.'" *Guardian Loan Co. v. Early,* 47 N.Y.2d 515, 519, 419 N.Y.S.2d 56, 392 N.E.2d 1240 (1979) (quoting Third Preliminary Report of the Advisory Comm. on Practice & Procedure 314 (1959)). Finding an analogy between this provision and RPAPL § 1371, New York courts have held that a judgment debtor is entitled to a market-value credit when the judgment creditor executes upon real property of the judgment debtor and purchases the property at a sheriff's sale. *Wandschneider,* 346 N.Y.S.2d at 929–31.

In deciding whether the market-value credit applies in this case, we first must clarify the relative positions of the parties. The usual party protected by a market-value credit is a property owner who is indebted either on a mortgage or a judgment; upon foreclosure by the creditor, this debtor is threatened with a deficiency judgment disproportionate to the market value of his property, which he has lost in the foreclosure. In this case, Bokhari was the owner of the Vacant Land and the party most obviously protected by the market-value credit. Stochastic was exercising the rights of KPI as mortgagee, but KPI was also a co-obligor on the RICO Judgment.

We conclude that neither the language of section 1371(2) nor its laudable purpose supports the application of a market-value credit in this case. Appellants are not entitled to the benefit of the market-value credit provided in section 1371(2) because that section "only applies where a deficiency [judgment] is sought in regard to a mortgage debt." *FDIC v. Forte,* 94 A.D.2d 59, 463 N.Y.S.2d 844, 849 (1983). Where the action "is on a debt separate and apart from the mortgage debt," the section is inapplicable. *Commercial Trading Co. v. Freidus,* 114 A.D.2d 292, 499 N.Y.S.2d 43, 46 (1986). A situation similar to the one at hand was presented in *Forte,* in which the interest of one of the defendants in a mortgage was pledged as security for a loan. 463 N.Y.S.2d at 848–49. Both the defendant and the mortgagor defaulted on their respective obligations, and the lender, exercising its rights as pledgee, foreclosed on the mortgage. *Id.* In an action brought by the lender for a deficiency judgment against the defendant, the Appellate Division held that section 1371 was inapplicable. *Id.* at 849. Similarly, the judgment debt in this case was secured by defendant KPI's interest in the property as mortgagee. The mortgage debt was the debt owed by Bokhari to KPI for the 1989 purchase of the Vacant Land and is separate and distinct from the debt sued on here, i.e., the RICO Judgment. Accordingly, section 1371 should not have been applied to give appellants the benefit of the market value of the property.

Nor is Wagner entitled to a market-value credit under the rule announced in *Wandschneider.* This is not a case in which the judgment creditor is executing on real property owned by the judgment debtor. Here, Stochastic is foreclosing on property owned by a third party, Bokhari. It is merely exercising KPI's rights under the mortgage. The mortgage debt is separate and distinct from the debt sued upon here. *See Commercial Trading,* 499 N.Y.S.2d at 46. In *Wandschneider,* the court was protecting the judgment debtor against a double recovery by the judgment creditor. Without application of a market-value credit, the judgment debtor would have lost his property and still have been required to pay a large deficiency judgment. Here, KPI's only interest in the property was that of a foreclosing mortgagee. Wagner does not claim that had KPI completed the foreclosure itself it would have obtained a higher bid than that of Stochastic. Accordingly, there has been no prejudice to KPI (and hence Wagner) and any windfall to Stochastic is merely the benefit of the bargain it received by purchasing the property at a foreclosure sale—a sale which KPI would have held in any event. Accordingly, there was no basis for invoking CPLR § 5240 in this case.

Since appellants were not entitled to a market-value credit in this case, the deficiency judgment should be calculated on the basis of the actual sale price, $1.205 million, rather than the market value of the Vacant Land.

### b. Real Estate Taxes

█ In calculating the deficiency judgment, the district court deducted from the purchase price the outstanding taxes on the property as of January 1, 1993, plus interest, which totaled $432,598.57. This figure was reflected in a tax bill dated June 3, 1993, which included interest through May 25, 1993. Another tax bill submitted to the district court dated January 19, 1993 indicates that the open taxes plus interest as of that date totaled $399,390.44. Both bills reflected a January 1, 1993 tax liability of $69,195.72, representing the taxes for the first half of 1993. These taxes were due and payable on January 1, 1993, when they also became a lien on the property. Wagner argues that because the January 1, 1993 tax assessment was a prepayment for the first half of 1993, the buyer of the property, Stochastic, should bear the cost of tax attributable to the period after the January 15 auction, approximately $64,000. Accordingly, he argues, the deficiency judgment should be reduced by that amount.

Pursuant to RPAPL § 1371(1), a deficiency judgment against a person liable on a mortgage debt is based on the "residue ... of the debt remaining unsatisfied, after a sale of the mortgaged property and the application of the proceeds, *pursuant to the directions contained in such judgment.*" (emphasis added). Thus, the statute anticipates that taxes will be allocated according to the instructions in the judgment of foreclosure. We see no reason why the same rule should not be applied in this case, where the deficiency judgment is against a judgment debtor. The judgment of foreclosure and sale in this case directs the referee to pay out of the proceeds of the sale "the real estate taxes, assessments, water charges and sewer rents which are or may become liens on the premises with interest or penalties which may have became due to the date of payment." The parties do not dispute that the taxes for

the first half of 1993 became a lien on the property as of January 1, 1993, before the sale date. Accordingly, the entire January 1, 1993 tax assessment properly was deducted from the purchase price in calculating the deficiency judgment.

Appellants also argue that the district court erroneously allocated from the purchase money the interest on the taxes that became due after the sale date. We agree. As noted, the tax bill that the district court used to calculate the taxes reflected interest through May of 1993. There is no indication why the court included interest through May of 1993, since that date bears no relation to the events in this case. The taxes plus interest that were due and a lien on the property at the time of the sale on January 15, 1993 were $399,390.44. In accordance with the judgment of foreclosure and sale, there is no basis for crediting against the purchase price interest that accrued after the sale date. Moreover, the additional interest accrued due to Stochastic's failure to close on February 16, 1993 as required by the Terms of Sale governing the auction. Stochastic was required to close on this date unless the referee deemed it proper to extend the time for completing the sale. There is no evidence that Stochastic requested the referee to extend the closing date, and, as the district court concluded, Stochastic's reasons for failing to close on February 16 are unpersuasive. Stochastic argues that it was justified in missing the closing date because Wagner had requested the referee not to close the deal and because, in March of 1993, Bokhari filed a *lis pendens* on the property. The district court concluded that Stochastic was not justified in failing to close the deal, and this finding was not clearly erroneous. Even if Wagner had requested the referee to delay the closing, the referee did not do so. Moreover, the fact that Bokhari filed a lis pendens *after* the scheduled closing date cannot possibly excuse Stochastic's failure to close. Since the additional interest accrued due to Stochastic's delay, it should bear the expense rather than Wagner.

On cross appeal, Stochastic argues that, in addition to the taxes for the first half of 1993, the district court should have subtracted

from the purchase price the taxes for the second half of 1993, which became due and a lien on the property on July 1, 1993. Stochastic's argument is grounded in its claim that it was Wagner's fault that the closing was delayed, a claim we have held to be without merit. In sum, in calculating the deficiency judgment, the district court should have subtracted from the purchase price the taxes due plus interest due on the sale date, $399,390.44.

### c. Recalculation of Deficiency Judgment

On remand, the district court should recalculate the deficiency judgment utilizing the actual bid price for the Vacant Land, rather than the market value, and should allow out of the bid price the real estate taxes plus interest that had attached as a lien on the property prior to the sale date, January 15, 1993.

### 2. Turnover of Profit Sharing Plan Proceeds

■ Wagner contends that the funds in the profit sharing plan are protected from execution by operation of CPLR § 5205(c). This contention is without merit. Section 5205(c)(1) exempts from application to the satisfaction of money judgments "all property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor." Under CPLR § 5205(c)(2), a trust qualified under section 401 of the Internal Revenue Code, "shall be considered a trust which has been created by or which has proceeded from a person other than the judgment debtor." To be qualified under section 401, a profit sharing plan created by an employer must be "for the exclusive benefit of his employees or their beneficiaries." 26 U.S.C. § 401(a). Based on this definition, the district court correctly concluded that Wagner's profit sharing plan was not qualified because it included as a beneficiary Lucille, who was not an employee. See, e.g., Professional & Executive Leasing, Inc. v. Commissioner, 862 F.2d 751, 752–54 (9th Cir.1988) (plan including non-employees is not qualified under section 401). The plan thus was not protected by CPLR § 5205(c). See In re Lane, 149 B.R. 760, 766–67 (Bankr.E.D.N.Y.

1993) (plan that was not qualified under § 401 not exempt under CPLR § 5205(c)(2)).

■ Wagner first argues that the district court erred when it concluded that Lucille was not an employee of Wagner's firm. The district court's determination was a factual finding subject to review for clear error. See Professional & Executive Leasing, 862 F.2d at 753. The evidence was more than sufficient to support the district court's conclusion. As the district court noted, Lucille's purported pay periods were highly unusual. In 1988, she received her entire pay of $15,000 over the course of three weeks in September, and for 1989 the only checks introduced showed she had been paid only two-thirds of her alleged salary. Moreover, no evidence was produced showing payment of social security or withholding tax for Lucille, even though Wagner asserted that he made such payments. The district court also noted the statements made by Lucille during the RICO litigation that she was not an employee. The district court was entitled to discredit her proffered excuse for the contradictory statements concerning her employment status. Lucille's contradictory statements, coupled with the inadequate documentary proof that she was a bona fide employee, led the Magistrate Judge to the "inescapable conclusion that Lucille Wagner is not an employee of her husband." This conclusion, adopted by the district court, is not clearly erroneous.

Wagner also argues that the district court improperly disqualified the plan retroactively and cites a number of cases for the proposition that retroactive disqualification is proper only in limited circumstances. See, e.g., Gross Distrib. Co. v. Commissioner, 710 F.2d 249, 251 (6th Cir.1983). The issue of whether the plan should be retroactively disqualified is relevant only for determining the amount of tax to be imposed on the funds in the plan—a matter normally determined in the first instance by the Commissioner of Internal Revenue and a question not before this Court. Whether a plan is protected from judgment creditors is a separate question answered by reference to CPLR § 5205(c): only a qualified plan or trust is protected. Wagner's argument that the district court's

holding will have adverse tax consequences for Lee and him is irrelevant.

Wagner next argues that the plan is protected under CPLR § 5205(c), even though it is not qualified under IRC § 401, because it is a spendthrift trust. Outside of section 5205(c)(2), which protects qualified plans, section 5205(c)(1) protects a trust only if it "has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor." Here, the trust was created by Wagner, a judgment debtor. Thus, the plain language of the statute denies the protection Wagner seeks.

## CONCLUSION

We remand to the district court with instructions to revise the order directing entry of a deficiency judgment in accordance with the foregoing. We affirm the order of the district court directing the turnover of the profit sharing accounts.