Charles P. FLYNN, Plaintiff,

v.

Michael HACH, individually, and as Business Manager of Local 30, International Union of Operating Engineers, AFL–CIO; Local 30, International Union of Operating Engineers, AFL–CIO; Board of Trustees of the Joint Industry–Engineers Union Local 30 Pension Trust Fund; Board of Trustees of the Operating Engineers Local 30 Annuity Fund; and Frank Hanley, individually, and as General President International Union of Operating Engineers, AFL–CIO, Defendants.

No. 96 CV 2520(RR).

United States District Court, E.D. New York.

April 10, 2001.

Outten & Golden, LLP, New York City by Jack A. Raisner, for Plaintiff.

Lambert Weiss & Pisano, New York City by Arthur Lambert, for Defendants Boards of Trustees of the Pension and Annuity Funds.

O'Conner & Mangan, P.C., Long Island City, NY by J. Kenneth O'Conner, for Defendants Local 30, Michael Hach.

Vladeck, Waldman, Elias & Engelhard, P.C., New York City by Seymour M. Waldman, for Defendant Frank Hanley.

### Amended Memorandum and ORDER

RAGGI, District Judge.

Plaintiff Charles Flynn sues his former employer, Local 30 of the International Union of Operating Engineers, AFL–CIO ("Local 30" or "the Local"); Michael Hach, the former head of Local 30; Frank Hanley, the head of Local 30's parent union, the International Union of Operating Engineers ("the International"); and the Boards of Trustees of Local 30's pension and annuity funds ("the Trustees") for denying him benefits to which he claims he is entitled under the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. (1994). Flynn also asserts supplementary state law claims against Local 30.

All defendants move for summary judgment. Plaintiff opposes the motion and cross moves for summary judgment against the Trustees on a cause of action not pleaded explicitly in his complaint: equitable restitution of contributions made by Local 30 on his behalf to its pension and annuity funds. The Trustees' opposition to the cross-motion is fairly interpreted as a request for summary judgment in their favor on any restitution claim. Having carefully reviewed the submissions of the parties and heard oral argument, the court hereby denies plaintiff's motion for partial summary judgment, grants summary judgment in favor of defendants on all federal claims, and dismisses the state law claims as preempted by federal law.

### Factual Background

The following facts are either undisputed or viewed in the light most favorable to plaintiff. *See Nadel v. Play–By–Play Toys & Novelties,* 208 F.3d 368, 380 (2d Cir.2000).

1. *Flynn's Employment at Local 30 from 1971 to 1977 and His Participation in the Local's Pension Plans*

From 1971 until 1977, plaintiff Charles P. Flynn worked full-time as a salaried business agent for Local 30 reporting to business manager William Treacy. As a business agent, Flynn was eligible to participate in Local 30's pension and annuity plans, both of which are governed by ERISA. *See* 29 U.S.C. § 1002(2)(A) (defining "pension plan" to include funds that provide deferred income or retirement income to employees); *see also* Annuity Trust Fund Agreement § 4.02(a) (requiring Annuity Fund to be operated in compliance with ERISA); Pension Fund Trust Agreement § 4.02(a) (same).

The Local's two pension plans are "multi-employer plans," which means that they

are funded by contributions from several employers pursuant to the terms of a collective bargaining agreement between those employers and Local 30. 29 U.S.C. § 1002(37); Annuity Trust Fund Agreement, Preamble; Pension Trust Fund Agreement, Preamble. Further, since the Local is itself an employer, it contributes directly to these plans on behalf of its employees. *See* Annuity Trust Fund Agreement § 1.01; Pension Trust Fund Agreement § 1.01. In a multi-employer plan, the assets are not segregated into discrete accounts for each employer and its respective employees. Instead, the common assets are invested and used to pay pensions to the employees of all participants. *Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan,* 76 F.3d 462, 464 (2d Cir.1996). The plans at issue are jointly administered by boards of trustees comprised of an equal number of representatives from Local 30 and the other participating employers. *See* Annuity Trust Fund Agreement § 3.01, Pension Trust Fund Agreement § 3.01.

While employed as a business agent for Local 30, Flynn also edited the Local's newspaper, *The Recorder,* a sporadic publication consisting mainly of signed articles by union officials. For this work, plaintiff was paid a stipend of $400 per issue in addition to his regular salary.

### 2. *Flynn's 1977 Employment by the International*

Sometime in late 1976 or early 1977, the International offered Flynn a full-time position as a representative. In this capacity, plaintiff would provide service and assistance to various local unions, among them Local 30. As an International representative, Flynn would be supervised by a regional director who would, in turn, report to the general president of the International.

Flynn asserts that he was initially reluctant to accept the International position because (1) the salary was less than what he was earning as a business agent, and (2) the International benefit plan was not as favorable as those maintained by Local 30. He discussed the matter with William Treacy, who was Flynn's close friend as well as his supervisor at Local 30 and Chairman of the defendant Boards of Trustees. Treacy proposed to Flynn that the Local "keep him on the payroll" even after he went to the International. Treacy Dep. at 58. Flynn rejected the offer suggesting instead that the Local continue making contributions on his behalf to its benefit funds. Treacy agreed and submits that he discussed the arrangement with Local 30's then-counsel, Bob Brady, and International regional director Howard Dalton, both of whom consented to the proposal. Flynn insists that he would not have accepted a job at the International without the assurance of continued contributions to the Local 30 pension plans.

From 1977 to July 1992, Flynn worked as an International representative. For the first five of those years, he continued to edit *The Recorder* for Local 30, receiving the usual $400 stipend per issue. Local 30's tax records reveal that Flynn was paid a total of $800 in 1978 for this work, $1200 in 1979, $1600 in 1980, $1200 in 1981, and $800 in 1982. Thereafter, Flynn had little involvement with *The Recorder,* except to write occasional signed articles as an International representative.

In 1985, when William Treacy retired as Local 30's business manager, he discussed Flynn's benefit arrangement with his successor, defendant Michael Hach. Hach agreed that Local 30 would continue making contributions to the pension funds on Flynn's behalf.

### 3. Local 30 Ceases Making Benefit Contributions for Flynn

In the late summer of 1991, auditors reviewing Local 30's books and records questioned the propriety of the benefit contributions being made on behalf of Flynn and two other former Local employees. Mark Soroka, counsel to both the Local and its pension plans, reviewed the trust agreements as well as the applicable law and advised Michael Hach that Local 30 should cease further contributions on behalf of the three former employees. Hach received the same advice from Peter Bernstein, the Local's actuary. In September 1991, Hach notified Flynn that he was stopping future Local benefit contributions for him. Hach assured Flynn that the action was prospective and that he would be entitled to benefits based on all contributions to date.

### 4. The International Directs Local Unions to Make No Further Contributions on Behalf of Non–Employees

Sometime after his discussions with the auditors, Hach informed International president Frank Hanley of the history of Local 30 benefit payments for Flynn and the two other employees. Hanley opposed the payments, voicing concern that they (1) created the erroneous impression that the Local retained some influence over these International employees, (2) gave rise to a possible conflict of interest for the International employees on whose behalf local benefit contributions were being made, and (3) adversely affected the morale of those International employees who were not receiving benefit contributions from any local union.

On April 8, 1992, Hanley asked all International employees to advise him if local unions were making contributions on their behalf to local pension plans. Of sixty persons queried, five, including Flynn, replied affirmatively. On April 29, 1992, Hanley directed all local unions to cease making further payments to local benefit plans for International employees.

### 5. Flynn is Terminated

In 1991, Flynn had begun working with fellow International representative James Thomas to organize a staff union at the International. Like Flynn, Thomas had been the beneficiary of pension plan contributions by a former local union employer, in his case, Local 542. In late 1991, the new staff union forced a reluctant Hanley to negotiate an employment contract for its members. Thereafter, in April 1992, at about the same time that Hanley took his stand against local union benefit contributions for International employees, Flynn recalls being instructed to stop his unionizing activities. Two months later, on July 17, 1992, the International fired Flynn.

Flynn filed a complaint with the National Labor Relations Board, asserting that his union activities were the cause of his termination. Plaintiff's counsel advises that the matter was settled in February, 1999.

### 6. Government Investigations into Local 30 and Its Benefit Plans

In 1992, the United States Department of Labor's Office of Labor–Management Standards commenced a criminal investigation into various practices at Local 30. Although no formal charges were ever filed, the following year the Department's Pension and Welfare Benefits Administration decided to audit the Local's benefit plans. At the same time, the Internal Revenue Service audited the pension fund of Local 542.[1]

---

1. The record indicates that the Labor Depart-
ment and the IRS were working cooperative-

### 7. *Local 30's Internal Investigation*

In May 1994, attorney Mark Soroka reported to the defendant Trustees on the results of his year-long internal investigation into the propriety of the benefit contributions made by Local 30 on behalf of Flynn and other International employees. Soroka concluded that the payments were not authorized by either the Local's by-laws or the International's constitution since the International employees were no longer responsible to the Local's business manager. He recommended that the Local seek to recoup from the benefit funds the contributions erroneously made for these employees.

In June 1994, Hanley echoed these sentiments in a letter to the Labor Department in which he stated that all questioned contributions should be refunded to the local unions and any benefit credits accruing from these improper payments should be rescinded.[2] Hanley has acknowledged that he encouraged the Labor Department to declare the contributions illegal because Flynn and Thomas were asserting rights to the benefit contributions.

### 8. *Labor Department Orders the Trustees to Recalculate Flynn's Benefits*

In January 1995, the Labor Department notified defendant Trustees in writing that they "may have violated several provisions of ERISA." *See* Plaintiff's Exh. 23. Specifically, the letter cited violations (1) in the allocation of shared administrative expenses among the Local's benefit funds; (2) in an annual trustees' trip to a resort location; and (3) in the "acceptance of [Local 30's] contributions and credit of accrued benefits on behalf of ineligible participants," including plaintiff Flynn. *Id.* In subsequent correspondence, the Labor Department explained that the contributions at issue violated section 302 of the Labor–Management Relations Act, 29 U.S.C. § 186 (1994), since they were made on behalf of persons who were not common law employees of the Local. *See* Defendants' Exh. F. The Trustees were ordered to "recalculate the pension and annuity credits for the three individuals on whose behalf pension and annuity contributions were improperly made" or face an enforcement action. *Id.* After affording the Trustees some time to comment on these findings, the Labor Department reiterated the corrective measures it expected the Trustees to take:

> Your letter [of March 1995] indicates that pension and annuity credits will be recalculated for the three individuals on whose behalf pension and annuity contributions were improperly made. Recalculations are to cover the entire time period that such individuals were ineligible to accrue benefits. Please advise the Department when these actions have been completed.

Plaintiff's Exh. 67.

About this same time, the Internal Revenue Service advised the trustees of Local 542's pension plan that that local's practice of making contributions on behalf of its former employees now on the International payroll was a ground for revoking the plan's tax exempt status. It proposed settlement discussions to explore corrective actions, emphasizing that "[n]one of the [former employees] are entitled to any benefits accrued during the [questioned] periods." Plaintiff's Exh. 68.

---

ly, each focusing on a particular union local to avoid duplicative efforts.

2. Apparently, Local 30 never sought and its pension funds never made any refund of the contributions made on behalf of Flynn and other International employees.

Flynn sought to avoid the rescission of any part of his pension benefits by having his attorney detail for defendant Trustees work he had performed for Local 30 on his "own time" between 1977–91 that would make him eligible for contributions to the plans. *See* Plaintiff's Exh. 36. Mark Soroka inquired of the International's general counsel whether it agreed with Flynn's characterization. In a detailed response dated April 10, 1995, counsel replied that he did not. Indeed, he noted that Flynn had included the same work he now described as outside the scope of his International employment on his contemporaneous monthly International activity reports. *See* Plaintiff's Exh. 56.

When the Trustees met on April 12, 1995, they reviewed the letter from Flynn's attorney and were apprised of the contrary opinion of the International's counsel. Soroka reported on the adverse findings of the Department of Labor with respect to contributions made to the Local 30 funds and the similar findings of the IRS with respect to contributions to the Local 542 funds. He recommended that the Trustees immediately rescind the benefit credits earned by Flynn and the other two employees for those periods of time when they were not common law employees of Local 30. The Trustees unanimously adopted this recommendation, concluding that the former Local employees did not "meet the definition of a Participant as stated in the Plan rules" during the questioned period. Plaintiff's Exh. 43.

As a result of these actions, Flynn's benefits under the Local 30 plans are calculated only with respect to contributions made up until 1977, when he moved to the International. He does receive benefits under the International plan for the years 1977 to 1992.

## Discussion

### I. Standard of Review

A court may grant summary judgment only if no genuine issue of material facts remains for adjudication, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). The moving party has the initial burden of demonstrating that there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If this burden is met, the non-moving party must then come forward with sufficient evidence on elements essential to its case to support a verdict in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Mere "conclusory allegations, conjecture, and speculation" will not suffice to create a genuine issue of material fact. *Kerzer v. Kingly Mfg.*, 156 F.3d at 400. Where evidence is adduced by both sides, however, a reviewing court must resolve all factual ambiguities and draw all inferences in favor of the non-movant. *Heyman v. Queens Village Comm. for Mental Health for Jamaica Community Adolescent Program Inc.*, 198 F.3d 68, 71 (2d Cir.1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Only if no rational trier of fact could find in the non-movant's favor is summary judgment appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. 1348.

### II. Claims Arising Under ERISA

#### A. The Trustees' Denial of Benefits— ERISA § 502(a)(1)(B)

Pursuant to ERISA § 502(a)(1)(B), Flynn sues the Trustees of Local 30's two pension plans "to recover benefits due to him under the terms of his plan[s], to

enforce his rights under the terms of the plan[s, and] to clarify his rights to future benefits under the terms of the plan[s.]" 29 U.S.C. § 1132(a)(1)(B). As courts have noted, a claim under this section of ERISA is, "in essence, the assertion of a contractual right." *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999). ERISA does not, however, contemplate the enforcement of oral contracts since the terms of the plan must, by law, be in writing. 29 U.S.C. § 1102(a)(1); *Moore v. Metro. Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988). Similarly, the law expects that any amendments to an ERISA plan will also be in writing. *See Schonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 78 (2d Cir.1996). Thus, Flynn can only sue under ERISA to enforce rights specifically conferred by the written terms of the Local 30 plans and not to enforce any oral promises or amendments to the plans.

### 1. *The Standard for Reviewing the Trustees' Decision*

▮ The standard for this court's review of the Trustees' decision to deny certain benefits to plaintiff was set forth by the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989): "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Where plan documents do confer discretion on trustees, however, courts will not substitute their own judgment unless the trustees' interpretation of the plan is "arbitrary and capricious." *Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan,* 76 F.3d 462, 466 (2d Cir.1996); *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995). This standard is "highly deferential," *Jordan v. Ret. Comm. of*

*RPI,* 46 F.3d 1264, 1271 (2d Cir.1995), and is limited to the administrative record, i.e., "the evidence before the Trustees," *Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir.1995).

In this case, § 4.02(b) of both the Annuity Trust Fund Agreement and the Pension Trust Fund Agreement confers discretionary authority on the Trustees to construe the plan and determine eligibility: "Any construction of this Trust Agreement ... and all rules and regulations adopted by action of the Trustees for [its] administration ... shall be binding upon ... all persons claiming any Benefits [thereunder]." *See Jordan v. Ret. Comm. of RPI,* 46 F.3d at 1269-70 (finding discretionary authority in language allowing a committee to "pass upon all questions concerning the application or interpretation of provisions of the Plan"); *Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan,* 76 F.3d at 466 (finding discretionary authority in language providing that trustees' decisions concerning plan interpretation "will be final").

Flynn does not seriously contest the sufficiency of the discretionary provisions in the plans' documents. Instead, he argues that the Trustees are not entitled to deference in their handling of his case because they were burdened by conflicts of interest. To support such a claim, a plaintiff has the burden of proving more than a potential conflict; he must demonstrate that the trustees were " *'in fact* influenced by the conflict of interest.'" *Pulvers v. First UNUM Life Ins. Co.,* 210 F.3d 89, 92 (2d Cir.2000) (emphasis in original) (quoting *Sullivan v. LTV Aerospace & Def. Co.,* 82 F.3d 1251, 1256 (2d Cir.1996)).

Flynn's conflict argument is three-pronged. First, he asserts that the Trustees denied him benefits in a self-serving attempt to forestall further Department of Labor inquiry into the other transgres-

sions noted in their January 1995 letter. Second, Flynn submits that the Trustees, as beneficiaries of the pension plans, stood to gain personally by canceling some of Flynn's credits. Finally, he argues that the Trustees' decision was influenced by International President Hanley, who wished to punish Flynn for his union organizing activities. None of these claims, however, is supported by evidence sufficient to raise a triable issue of fact.

The first point is based entirely on speculation and conjecture. See Kerzer v. Kingly Mfg., 156 F.3d at 400 (summary judgment cannot be avoided by advancing "[c]onclusory allegations, conjecture, and speculation"). Nothing in the record indicates that the Trustees sought or that the Labor Department offered leniency with respect to other questioned conduct in exchange for rescission of Flynn's benefit plan credits. What the evidence before the court does show is that the Labor Department was prepared to commence an enforcement action on the issue of benefit contributions unless the Trustees reduced Flynn's credits to eliminate the "entire time period" that plaintiff was employed by the International and thereby "ineligible to accrue benefits" in the Local's plans. Plaintiff's Exh. 67.

Similarly unsupported by any admissible evidence is Flynn's claim that the Trustees canceled some of his benefits to enhance their own share of plan funds. In Pagan v. NYNEX Pension Plan, 52 F.3d at 442, the Court of Appeals ruled that an actual conflict of interest was not established by the mere fact that the administrators of an employer-maintained plan were also beneficiaries. Something more was required as, for example, in Sullivan v. LTV Aerospace & Def. Co., 82 F.3d at 1257, where evidence was adduced that the employer sponsor of a benefit plan was facing severe financial difficulties, and the administrator employees were "aware that costs had to be cut in any way possible, and that significant downsizing was likely." Flynn has adduced no evidence comparable to that in Sullivan.

Finally, Flynn's assertion that Hanley unduly influenced the Trustees does not so much present an issue of conflict of interest as raise a question of "who actually made the benefit determination." Sharkey v. Ultramar Energy Ltd., 70 F.3d 226, 229 (2d Cir.1995). The law is clear that "[w]here an unauthorized party makes the determination" to deny plan benefits, the decision is properly "reviewed under the de novo standard." Id. In this case, however, the evidence does not support a finding of unauthorized decision-making by Hanley in place of the Boards of Trustees. While plaintiff is correct that Hanley advocated the recission of Flynn's benefit credits, the record shows that he took this stand openly because he opposed any contributions to local benefit plans on behalf of International employees as both illegal and corrupt. No evidence indicates that Hanley ever sought to exert improper influence on the defendant Trustees as they made a final decision in Flynn's case, nor that the Trustees abdicated their independent judgment on this issue. To the contrary, the uncontroverted evidence demonstrates that the Trustees were advised by counsel that both the Labor Department and the IRS had concluded that the benefit contributions made on behalf of non-Local employees violated federal law. Further, counsel reported that his own legal research revealed no support in the law for the credits. To the extent Flynn's counsel sought to justify the credits with evidence of "independent work" done for the Local, counsel advised the Trustees that this claim was contradicted by plaintiff's contemporaneous work reports to the International.

Under these circumstances, the court finds as a matter of law that the Trustees, not Hanley, made the decision to rescind Flynn's benefits,[3] that the decision was not the product of any conflict of interest, and that the Trustees are entitled to have their benefits determination reviewed under the deferential "arbitrary and capricious" standard.

### 2. Was the Trustees' Decision Arbitrary and Capricious?

The Trustees explain that they rescinded Flynn's benefit credits for the years he was employed as an International representative because he did not then "meet the definition of a Participant as stated in the Plan rules." Plaintiff's Exh. 43. Under those rules, a participant must be a "staff member or employee" of Local 30. *See* Annuity Plan Rules § 1.07; Pension Plan Rules § 1.09. On advice of counsel, the Trustees interpreted this definition as limited to employees at common law. *See* Plaintiff's Exh. 43. Under the highly deferential "arbitrary and capricious" standard of review, this court cannot disturb

the Trustees' decision unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999). The court concludes that the Trustees' decision was not so deficient.

### a. Limiting Participants to "Common Law Employees"

▮▮ Flynn faults the Trustees for focusing on the term "employee" and ignoring "staff member" in their consideration of eligible plan participants. He proffers deposition testimony from Treacy, who states that the "staff member" language was added to the plan documents in 1968 precisely to permit those leaving the Local to work for the International to continue to participate in the Local benefit plans. *See* Treacy Dep. 13–14, 101, 169. In response, the Trustees proffer three reasons why it was not arbitrary and capricious for them to interpret "staff member or employee" as limited to common law employees of Local 30.[4]

---

**3.** Because the evidence plainly demonstrates that the Trustees exercised independent judgment in concluding that Flynn was not entitled to participate in the Local's benefit plans after 1977, summary judgment must also be awarded to defendant Hanley on plaintiff's ERISA § 510 claim. That law prohibits any person from discharging, fining, suspending, expelling, disciplining, or otherwise discriminating against a plan participant or beneficiary "for exercising any right to which he is entitled under the provisions of an employee benefit plan" or those federal laws protecting such rights. 29 U.S.C. § 1140. Hanley took none of these prohibited actions. He did strongly voice his views that local unions should not be making benefit contributions to their pension plans on behalf of International employees, but expressive conduct, without more, is not violative of Flynn's "rights" under the Local 30 plans. Indeed, in this case, Hanley's view that plaintiff had no "right" to participate in the Local 30 pension plans after 1977 was ultimately adopted by both the Department of Labor and the IRS.

**4.** The common law test for "employee" status does not reduce to a "shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). Among these are

the hiring party's right to control the manner and means by which the product is accomplished[;] ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee

First, they submit that ERISA itself restricts participation in "pension plans" to common law employees. The court agrees, but notes that the route to this conclusion is not direct. ERISA defines a pension plan in relevant part as a fund that "(i) provides retirement income to *employees*, or (ii) results in a deferral of income for *employees* for periods extending to the termination of covered employment or beyond . . . ." 29 U.S.C. § 1002(2)(A) (emphasis added). ERISA's own definition of "employee" as "any individual employed by an employer," 26 U.S.C. § 1002(g), while broad is, nevertheless, "completely circular and explains nothing," *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. at 323, 112 S.Ct. 1344. It is the Supreme Court that has adopted the "common-law test for determining who qualifies as an 'employee' under ERISA." *Id.* (holding that common law employees have standing to sue under ERISA). Thus, because the trust fund agreements in this case require the Trustees to construe them in a manner "consistent with ERISA," Annuity Trust Fund Agreement § 4.03(d); Pension Fund Agreement § 4.03(d), because ERISA participation is limited to "employees," and because the Supreme Court interprets this to mean "common law employees," it was reasonable for the Trustees to conclude that the "staff members or employees" qualified to participate in the Local 30 pension plans were those persons who were "common law employees."

The Trustees further support their interpretation by pointing to the identical conclusion of the Department of Labor. The Department opinion was based not on ERISA but on the "exclusive benefit rule," codified at section 302 of the Labor–Man-

agement Relations Act, 29 U.S.C. § 186(c)(5), which requires that multi-employer funds be administered "solely for the benefit of the employees" of contributing employers. As with ERISA, however, courts rely on common law principles to define "employees" under section 302. *See Illinois Conference of Teamsters & Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 460 (7th Cir.1994) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. at 325, 112 S.Ct. 1344). Thus, in a letter to Flynn's counsel, the Department's solicitor explained that regardless of the plans' reference to staff members, "the Trustees could not legally have allowed Mr. Flynn to accrue Pension and Annuity Benefits during a period of time when he was not a *common law* employee of the Local." Defendant's Exh. F (emphasis in original).

Finally, the Trustees note that § 2.05 of both benefit fund agreements mandates that the Trustees administer the funds in compliance "with the requirements of the Internal Revenue Code" so that employer contributions will remain tax deductible and income from the funds will remain tax exempt in accordance with 26 U.S.C. § 501(a) (1994 & Supp.2000). Section 501(a) provides that an "organization described in . . . section 401(a) [of the Internal Revenue Code] shall be exempt from taxation," subject to certain exceptions not relevant here. *See generally O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 62 (2d Cir.1994) ("Under Code Section 401(a), a pension plan must fulfill various requirements in order to constitute a qualified plan . . . ."). To be qualified under § 401(a), however, an employer pension plan must be "for the exclusive benefit of . . . employees or their

benefits; and the tax treatment of the hired party.
*Id.* at 323–24, 112 S.Ct. 1344 (quoting *Community for Creative Non–Violence v. Reid*, 490

U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)); *accord Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir.2000).

beneficiaries." 26 U.S.C. § 401(a) (1994 & Supp.2000). The Second Circuit has expressly ruled that a "plan including non-employees is not qualified under section 401." *Stochastic Decisions, Inc. v. Wagner,* 34 F.3d 75, 82 (2d Cir.1994) (citing *Prof'l & Executive Leasing, Inc. v. Comm'r,* 862 F.2d 751, 752–54 (9th Cir. 1988)).

Although the Internal Revenue Code does not itself define "employee" as the word is used in § 401(a), in this area as in the other two statutes already discussed, it is well-settled by the courts that Congress intends a common law definition of that term unless legislation "clearly indicates otherwise." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. at 325, 112 S.Ct. 1344 (citing *Community for Creative Non-Violence v. Reid,* 490 U.S. at 739–40, 109 S.Ct. 2166); *c.f.,* 26 U.S.C. § 3121(d)(1994 & Supp.2000) (specifically providing a broader definition of "employee" for purposes of

the Federal Insurance Contributions Act, 26 U.S.C. §§ 3101–3127 (1994 & Supp. 2000)). The Trustees' interpretation of § 401(a) as limited to common law employees is supported, of course, by the IRS's own reference to that statute in faulting Local 542 for its benefit plan contributions on behalf of former Local employees then working for the International. *See Thomas v. Bd. of Trs. of Int'l Union of Operating Eng'rs, Local 542,* 1998 WL 334627 *3, No. 97–CV–2423, 1998 U.S. Dist. LEXIS 9210, at *9 (E.D. Pa. June 24, 1998) ("[T]he IRS contended that because Local 542 was making contributions on behalf of two non-employees, ... the ERISA Funds had lost their status as qualified trusts under § 401(a) ....").[5]

For all these reasons, this court concludes that the Trustees acted reasonably and well within their discretion in concluding that those "staff members or employ-

---

**5.** The Annuity Trust Fund requirement that it remain tax-qualified provided the Trustees with yet another reason for rescinding Flynn's annuity plan credits quite apart from the issue of his "employee" status.

The Local 30 Annuity Fund is a "defined contribution fund," which means that a specified contribution is paid by an employer for each employee. Section 415(c)(1) of the Internal Revenue Code limits such contributions to the lesser of $30,000 per year or "25 percent of the participant's annual compensation." 26 U.S.C. § 415(c)(1) (1994). If contributions exceed this amount, the fund loses its tax-qualified status. 26 U.S.C. § 415(a)(1)(B). Flynn's total compensation from Local 30 during the period from 1977 to 1991 was $5,600. Thus, the maximum possible contribution under § 415(a)(1)(B) would have been $1,400. In fact, the Local contributed closer to $100,000 on Flynn's behalf to the annuity fund during that time.

At oral argument, Flynn's counsel relied on the unpublished decision in *IBEW Local 2154 v. Nat'l Fuel Gas Distrib. Corp,* No. 92–CV–0403E, 1993 WL 7541, 1993 U.S. Dist. LEXIS 376 (W.D.N.Y. Jan. 13, 1993), to argue that even if the Local's contributions to the annuity plan on his behalf adversely affected the

fund's tax status, they were not illegal. *See id.* 1993 WL 7541 at *4 ("Disqualification might be an undesirable result for the plan but section 415 does not prohibit" contributions exceeding 25% of the participant's compensation). In fact, *IBEW* is of little help to plaintiff. It was not an ERISA case; instead, it was an employee action for breach of a collective bargaining agreement. *See id.* at *1. The district court simply ruled that the employer could not use § 415(c)'s limitations to avoid its contractual obligations under the collective bargaining agreement to make specific annuity fund contributions on behalf of the plaintiff-employees. *See id.* at *4. In this case, no collective bargaining agreement required Local 30 to make contributions to the Annuity Fund on Flynn's behalf after 1977. Neither is there any written document requiring the Trustees to credit those contributions. Instead, the Annuity Trust Fund Agreement specifically obliges the Trustees to take all actions necessary to maintain the tax-qualified status of the fund. The Trustees' interpretation of participant eligibility is entirely consistent with this provision, whereas that advanced by plaintiff is not.

ees" eligible to participate in the Local's pension and annuity plans were individuals who qualified as "common law employees."

### b. *Flynn's Ineligibility under the Local's Plans*

■ Because the Trustees' interpretation of the terms of the two plans was reasonable, their decision that Flynn was ineligible to participate in Local 30's benefit plans after 1977 must be upheld so long as it was "based on a consideration of the relevant factors" and supported "by substantial evidence." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). Substantial evidence means "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker." *Id.* The standard "requires more than a scintilla but less than a preponderance" of evidence. *Id.* In this case, the record plainly demonstrates that the Trustees did consider the relevant factors and did have substantial evidence to support their finding of ineligibility.

Preliminarily, the court notes that the Trustees' conclusion was the end product of a year-long investigation by counsel during which witnesses were interviewed, documents analyzed, and relevant case law reviewed. Counsel's detailed report concluding that the Local should not have made benefit plan contributions on Flynn's behalf was supplied to plaintiff and his attorney for their comment. *See* Plaintiff's Exh. 46. The Trustees then reviewed plaintiff's lengthy response, *see* Plaintiff's Exh. 36, and inquired as to Flynn's work responsibilities for the International before reaching their final conclusion that, after 1977, plaintiff had not been a Local 30

employee eligible to participate in its benefit plans.

As noted earlier, a variety of common law factors are relevant to deciding whether an individual is an employee or an independent contractor. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. at 324, 112 S.Ct. 1344; *Community for Creative Non-Violence v. Reid*, 490 U.S. at 751–52, 109 S.Ct. 2166. But as the Second Circuit has observed, a "prerequisite" to considering these factors "is that the individual have been hired in the first instance," receiving "compensation ... in exchange for services." *O'Connor v. Davis*, 126 F.3d 112, 115–116 (2d Cir.1997). With the exception of brief periods in 1977–1982 when Flynn edited Local 30's newsletter, *The Recorder*, it appears that plaintiff was not performing services for or receiving wage compensation from Local 30 in the years 1977–1992. Flynn's belated efforts to characterize his attendance over the years at various Local meetings as work performed for Local 30 was properly rejected by the Trustees. The evidence showed that such attendance was part of Flynn's duties as an International representative and that he himself had listed it as such on his monthly activity reports to the International.

As for Flynn's work on the newsletter, the evidence before the Trustees showed that plaintiff's efforts were brief and sporadic, that he performed this task in such manner and at such times and locations as suited him, that his performance was not supervised by anyone at Local 30, and that he was paid only upon completion of each edition with no withholding for income taxes, unemployment, or Social Security.[6]

---

**6.** It appears that defendant Hach advised the Trustees that Flynn had produced only "two or three issues" of the newsletter for a payment of $200 per issue. *See* Plaintiff's Exh. 43. This was inaccurate. The records show

that Flynn edited two editions of *The Recorder* in 1978, three editions in 1979, four editions in 1980, three editions in 1981, and two editions in 1982. Further, he was paid $400 per edition completed. While in some circum-

These circumstances amply support the Trustees' conclusion that Flynn's work on *The Recorder* was not performed as a common law employee of Local 30 and, thus, that he was ineligible to participate in the Local's benefit plans. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. at 323–24, 112 S.Ct. 1344; *Community for Creative Non–Violence v. Reid*, 490 U.S. at 751–52, 109 S.Ct. 2166; *c.f. Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d at 114 (holding that hiring party's control over the "manner and means" by which an employee performs work is generally the most important factor in establishing an employer-employee relationship). Further, the evidence shows that there was no relationship between the small payments for Flynn's editorial work and the large contributions made on his behalf to the benefit plans, a relationship that was plainly required by 26 U.S.C. § 415(c)(1) for the funds to maintain their favorable tax status as required by the plans.

Because the Trustees' decision that Flynn was not eligible to participate in Local 30's benefit plans after 1977 was not arbitrary or capricious, and because it is supported by substantial evidence, this court grants summary judgment in favor of the Trustees on plaintiff's ERISA § 502(a)(1)(B) claim for wrongful denial of benefits.

## B. The Trustees' Breach of Fiduciary Duty—ERISA § 404(a)(1)

■ Flynn submits that the Trustees' denial of benefits for contributions made by Local 30 on his behalf after 1977 violated their fiduciary duty under ERISA § 404(a)(1) to administer the plans solely in the interest of the participants.[7] Section 404(a)(1) provides in pertinent part as follows:

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an

___

stances trustees' reliance on inaccurate or limited information to deny a claim may require a remand, *c.f. Miller v. United Welfare Fund*, 72 F.3d at 1072 (trustees' reliance on incomplete three-sentence report could not support denial of benefits), in this case, remand is unnecessary since a full account of Flynn's work on *The Recorder* does not alter the reasonableness of the conclusion that Local 30 exercised little, if any, control over the manner and means by which Flynn chose to perform this assignment.

7. Flynn also brings a fiduciary claim against Hach claiming that this defendant did not deal fairly and honestly with him when he determined that Flynn was not an "employee or staff member" of Local 30. To the extent this claim is brought against Hach because he served as a Trustee of the funds, it fails for the reason stated in this subpoint. To the extent it is brought against Hach in his capacity as business manager of Local 30, it fails because, in this capacity, Hach was not a "fiduciary" of the multi-employer plans. *See* 29 U.S.C. § 1002(21)(A) (defining ERISA fiduciary as a person who (1) exercises discretionary authority respecting the management of a plan or any authority respecting the plan's assets, or (2) renders investment advice for a fee to the plan, or (3) has discretionary authority in the administration of the plan); *Thomas v. Bd. of Trs. of Int'l Union of Operating Eng'rs, Local 542*, 1998 WL 334627 at *8–9, 1998 U.S. Dist. LEXIS 9210, at *25–26 (holding that local was not an ERISA fiduciary of a multi-employer pension plan to which it contributed).

enterprise of a like character and with like aims;

. . . .

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter . . . .

29 U.S.C. § 1104(1)(A), (B), & (D).

Plainly, Flynn's ability to sue for violation of this section depends on his status as a plan participant. This court has already ruled that the Trustees acted reasonably in interpreting plan documents and concluding that Flynn was not a participant in the Local's benefit plans after 1977. The same deference to trustees' interpretations is accorded under ERISA § 404(a)(1) as under ERISA § 501(a)(1)(B). *See Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan,* 76 F.3d at 466. Thus, plaintiff cannot recast his unsuccessful benefits claim as one for breach of fiduciary duty.

■ Further, ERISA § 404(a)(1) "does not require . . . that a fiduciary resolve every issue of interpretation in favor of the plan beneficiaries," *O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.,* 37 F.3d at 61, much less in favor of every person seeking recognition as a participant. Rather, the section requires trustees to exercise reasonable prudence in seeking to promote the welfare of all plan participants consistent with the applicable governing documents and laws. In this case, the Trustees rescinded Flynn's benefit fund credits only after two federal agencies, the Labor Department and the IRS, had challenged the legality of local unions making benefit contributions on behalf of former employees. The Trustees knew that their failure to take corrective action could prompt a Labor Department enforcement action and jeopardize the funds' favorable tax status. Under these

circumstances, it is plain as a matter of law that the Trustees' actions, though contrary to Flynn's personal interests, were consistent with their fiduciary duties to the funds' participants and beneficiaries. Summary judgment is granted in favor of the Trustees on plaintiff's § 404(a)(1) claim.

### C. ERISA Estoppel

■ In the event this court rejects his § 502(a)(1)(B) and § 404(a)(1) claims, Flynn appeals to equity to estop the Trustees from denying him benefits for the years 1977 to 1992, since in 1977 William Treacy had promised that Local 30 would continue to make contributions on plaintiff's behalf even if he decided to work for the International.

29 U.S.C. § 1132(a)(3)(B) does permit an ERISA action to be maintained "to obtain other appropriate equitable relief." To pursue a claim of promissory estoppel in the context of ERISA, however, a plaintiff must adduce evidence supporting five elements: (1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, (4) an injustice if the promise is not enforced, and (5) "extraordinary circumstances." *E.g., Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir.1999). The last element, which supplements the four generally required for estoppel at common law, derives from the view that "[t]he actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan." *Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032, 1041 (2d Cir.1985); *accord Aramony v. United Way Replacement Benefit Plan,* 191 F.3d at 153 (rejecting suggestion that "extraordinary circumstances" are not required in ERISA

cases absent proof of a demonstrated risk to the actuarial soundness of the plan at issue).

In this case, the parties do not dispute that Treacy promised Flynn that Local 30 would continue making contributions on his behalf to its pension funds after plaintiff started working as an International representative. Neither do they dispute Flynn's reliance on this representation in taking the International position, nor, at least for purposes of this motion, do they dispute his claim of injury. What is disputed is whether Treacy made the promise to Flynn only in his capacity as business manager of Local 30 or also as chairman of the defendant Boards of Trustees. Certainly, the deposition testimony of the parties suggests that Treacy's commitment was made pursuant to his authority as the Local's business manager. *See* Treacy Dep. at 74–76, 172–73; 1998 Flynn Dep. at 11; Hach Dep. at 102–04. This is significant because, as a rule, estoppel will apply only against the party making a particular promise. *See* Restatement (Second) Contracts § 90 (1981). In ERISA cases, where courts are loath to apply estoppel even to trustee promises to obligate pension funds except in the most extraordinary circumstances, estoppel claims based on benefit promises by third parties such as union representatives or business managers are routinely rejected, particularly in the case of multi-employer plans. *See Chambless v. Masters, Mates & Pilots Pension Plan,* 772 F.2d 1032 (rejecting estoppel claim against plan based on representation by union representative); *Galvez v. Local 804 Welfare Trust Fund,* 543 F.Supp. 316 (E.D.N.Y.1982) (Neaher, J.) (union agent's representation about benefits due plaintiff did not estop fund from reaching different calculation since "estoppel can only operate against the party making the representation").

Indeed, in *Gary v. Pension Fund of Int'l Union of Operating Eng'rs,* 101 F.3d 682 (2d Cir.1996), the Second Circuit applied this principle to a case similar in many respects to the one before this court. In *Gary,* whose unpublished decision is reported at 101 F.3d 682 (2d Cir.1996), plaintiff, like Flynn, moved from a job with his local union to a position with its parent International relying on a promise from his local's business manager that he would continue to be eligible for benefits under the local's pension plan. Despite the fact that the local made the promised contributions, the fund subsequently denied Gary benefits for those years when he was employed by the International. Gary argued that the business manager's promise estopped the fund from denying him benefits. The Court of Appeals disagreed. Relying on *Chambless v. Masters, Mates & Pilots Pension Plan,* it held that "the alleged promise by the local's business manager ... came from a person without authority to commit benefits from the pension fund." *Id.* 1996 WL 189679 at *2. It is not clear whether the business manager in *Gary* held any position on the fund's Board of Trustees, as Treacy did in this case. As already noted, however, Treacy's deposition indicates that his promise was made strictly in his capacity as business manager of the Local rather than as Trustee of the benefit funds. Indeed, since Flynn was himself a fund trustee in 1977, he well knew that Treacy's promise was never presented to the Board for its approval.

Even assuming, however, that Treacy's promise of continued benefit contributions were attributable to the defendant Trustees, Flynn's estoppel claim would still fail because he has not adduced evidence sufficient to establish the two remaining critical elements of an ERISA estoppel claim, i.e., extraordinary circumstances and injustice.

In *Devlin v. Transp. Communications Int'l Union*, 173 F.3d 94, 102 (2d Cir.1999), the Second Circuit explained that the "extraordinary circumstances" element of ERISA estoppel requires, at a minimum, "defendants' use of promised ... benefits as an inducement to persuade" an employee to take a particular course of action. That was the case in *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72 (2d Cir.1996), in which plaintiff was specifically induced to resign as defendant's chief operating officer by a letter promising particular severance benefits. By contrast, in *Devlin*, the appeals court refused to apply estoppel in the case of a plaintiff who had relied on promised medical benefits in timing his retirement since no evidence indicated that defendant actually "sought the retirement of" or used the promise of benefits "to intentionally induce any particular behavior on [plaintiff's] part." *Devlin v. Transp. Communications Int'l Union*, 173 F.3d at 102. Similarly in *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d at 151–53, the court ruled that defendant was not estopped from challenging benefit projections made by its agent to plaintiff since no evidence demonstrated "'remarkable consideration' such as the use of a promise of benefits to induce certain behavior" by plaintiff.

In this case there is no evidence before the court that Treacy, Local 30, or the defendant Trustees ever promised to continue benefit contributions for Flynn for the specific purpose of inducing him to leave his position with the Local and to assume the responsibilities of an International representative. To the contrary, the undisputed evidence is that Treacy viewed Flynn as a valuable asset to Local 30, someone whom he was reluctant to see leave. *See* Treacy Dep. at 80. Treacy may well have wished to help his friend avoid the diminution in benefits that would occur if he accepted the International job offer, but well-intentioned mistakes are not enough to establish the extraordinary circumstances required for ERISA estoppel. *See Cerasoli v. Xomed, Inc.*, 47 F.Supp.2d 401, 411 (W.D.N.Y.1999) ("arguments that negligent misrepresentations 'estop' sponsors or administrators from enforcing the plans' written terms have been singularly unsuccessful" (quoting *Decatur Mem'l Hosp. v. Connecticut Gen. Life Ins. Co.*, 990 F.2d 925, 926–27 (7th Cir.1993))). Similarly, the mere fact that Flynn relied to his detriment on Treacy's representations in changing jobs is not enough to render a case "extraordinary." *See Devlin v. Transp. Communications Int'l Union*, 173 F.3d at 102. Neither is it enough to show that Treacy reasonably expected Flynn's reliance. A "reasonable expectation of reliance," which some courts treat as a component of the "promise" element of an estoppel claim, *see Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d at 79 (and authorities cited therein), must not be confused with the "specific intent to induce" referred to in *Devlin* as the minimum necessary to establish extraordinary circumstances. Indeed, some courts go further and suggest that plaintiff must prove "affirmative acts of fraud or similarly inequitable conduct" to secure ERISA estoppel. *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir.1996). Because Flynn has not adduced evidence of either intentional inducement or fraud by Treacy or defendant Trustees, he fails to establish the extraordinary circumstances necessary to support a claim of ERISA estoppel.

A further defect in Flynn's estoppel claim is his inability to demonstrate that it was "unjust" for the Trustees to deny him benefits for years when he was not eligible under federal law to participate in the Local's pension plans. *See generally Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d at 80 (element of injustice is

equitable one for the court and not the jury). As already discussed at length in Point IIA2b, Flynn was not a common law employee of Local 30 after 1977 and, thus, under federal law, he was ineligible to participate in its pension plans. Nevertheless, what Flynn seeks in his estoppel claim is an order requiring defendant Trustees to pay him the benefits of a full-time Local 30 employee at the same time that he collects benefits as a full-time International employee. It may be, as plaintiff contends, that the International pension plan is less generous than that of Local 30, but that hardly supports the contention that it would be "unjust" to deprive Flynn of the ability to collect *both* pensions for years when he only worked for one employer.[8] To the contrary, what would be unjust is the use of estoppel to compel the Trustees to award Flynn benefits to which he is not entitled under federal labor law. *See Thurber v. W. Conference of Teamsters Pension Plan*, 542 F.2d 1106, 1109 (9th Cir.1976) (where employee made supplemental payment to pension plan at direction of plan administrator to qualify for early retirement benefits, but where such payment was not authorized by law, estoppel could "not be invoked to compel an illegal act," specifically, the payment of benefits in violation of federal labor law); *Moglia v. Geoghegan*, 403 F.2d 110 (2d Cir.1968) (where employer's failure to enter into a collective bargaining agreement made its contributions to union pension fund illegal under federal law, estoppel would not intervene to require payment of benefits to employees, even though they had engaged in no wrongdoing).

In sum, although it is far from clear that Treacy's "promise" of future benefits is even attributable to defendant Trustees, the court finds that plaintiff is nonetheless not entitled to estoppel since he has failed to demonstrate that it would be unjust for defendants to deny him full Local 30 pension benefits for the same years that he is collecting International benefits, and because this case does not present the sort of extraordinary circumstances required for equity to dictate the payment of ERISA benefits. Defendants' motion for summary judgment on the estoppel claim is hereby granted.

### D. *Equitable Restitution*

▆ In opposing defendants' motion for summary judgment, Flynn asserts for the first time that if his benefits claims fail, he is at least entitled to equitable restitution of the contributions erroneously made on his behalf to these plan funds. This court disagrees.

29 U.S.C. § 1103 permits an ERISA plan to return to an employer any contribution overpayments it may have made to a pension plan. *See Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund*, 976 F.2d 834, 834 (2d Cir.1992). Refunds are not required by ERISA; rather, a pension fund "is permitted" to make a refund "in accordance with its own policy." *Brown v. Health Care & Ret. Corp. of America*, 25 F.3d 90, 93 (2d Cir.1994). If a plan refuses to refund an overpayment, the contributing employer may sue for equitable restitution, but such an award will be made only upon a showing that the "refusal to repay was arbitrary or capricious and 'the equities favor restitution.'" *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers*

---

8. In exploring settlement with the parties, this court encouraged them to calculate the difference between Flynn's pension benefits under the International pension plan and what he would have received had he stayed with the Local. The parties are wildly apart in their estimates preventing any amicable resolution of the case.

*Supplemental Unemployment Benefit Fund,* 976 F.2d at 835 (quoting *Dumac Forestry Servs. v. Int'l Bhd. of Elec. Workers,* 814 F.2d 79, 83 (2d Cir.1987)). Federal courts review such claims with considerable deference to the judgment of fund administrators, recognizing that they "are in the best position to determine whether the equities of a particular case require a refund." *Brown v. Health Care & Ret. Corp. of America,* 25 F.3d at 94 n. 4.

Plainly, Flynn is not an *employer* suing for restitution of monies erroneously paid by him into a pension fund. Thus, whatever claim Local 30 may have to the restitution of overpayments it made on plaintiff's behalf, it hardly appears that equity demands restitution of these monies to Flynn. *Cf. Chase v. Trs. of W. Conference of Teamsters Pension Trust Fund,* 753 F.2d 744 (9th Cir.1985) (holding that taxicab drivers who were among the *owners* of a cooperative that had made contributions to defendant fund in the mistaken belief that drivers qualified as "employees" could sue for restitution);[9] *Peckham v. Bd. of Trs. of Int'l Bhd. & Allied Trades Union,* 724 F.2d 100 (10th Cir.1983) (holding that union members who were sole proprietors of business that made benefit contributions on their behalf to defendant fund could sue for restitution).

Flynn nevertheless pursues his restitution claim pointing to the award made to his union colleague, James Thomas, by the district court for the Eastern District of Pennsylvania. *See Thomas v. Bd. of Trs. of Int'l Union of Operating Eng'rs, Local 542,* 1998 WL 334627, 1998 U.S.Dist.LEX-IS 9210.. As already discussed in the Factual Background section of this Memorandum, Local 542 also contributed to its pension plan on behalf of former employees who went to work for the International. When the IRS concluded that these contributions were inconsistent with the tax-exempt status of the Local 542 fund, the trustees agreed to return the overpayments to the local to avoid an adverse tax ruling. Thereafter, Thomas sued Local 542, its fund trustees, and various individuals for wrongful denial of ERISA benefits. The district court granted summary judgment in favor of the trustees on Thomas's claims that they had wrongfully denied him benefits. *Id.* 1998 WL 334627 at *6–7. Similarly, it granted summary judgment in their favor on Thomas's breach of fiduciary duty and estoppel claims. *Id.* at *8–9. But on Thomas's claim of equitable restitution, the court held that plaintiff was entitled to the compensation overpayments that had been returned to Local 542 by the pension funds.

> In 1978, as part of its inducement to Thomas to accept a position with the International, Local 542 agreed to continue making contributions to the Pension Fund on his behalf. For the next fourteen years, the Local kept its promise. To now permit Local 542 to retain the retirement contributions that Thomas bargained for and earned would constitute a windfall to which the Local has no equitable claim.

*Id.* 1998 WL 334627 at *12 (citation to record omitted).

---

9. In concurring, Judge Reinhardt agreed that "in the case of a membership organization with no employees, the members of the organization may institute a suit for the refund of contributions if they do so as a class." *Id.* at 754. He was more doubtful as to whether a refund suit could be maintained by a portion of the membership. "Perhaps, under some circumstances, such a suit would be permissible. Under others, undoubtedly, it would not." *Id.* But Judge Reinhardt stated plainly that he did "not believe that [ERISA] contemplates that individual employees shall ordinarily have the right to institute suit for such refunds." *Id.* at 753.

*Thomas* is distinguishable from Flynn's case in a number of important respects. First, the equitable issue in *Thomas* was between plaintiff and Local 542. The court did not have to order disgorgement of any monies by the pension funds. This is significant because, as the Second Circuit has noted, even when there is a question of overpayment as between an employer and a pension fund, "Congress evidently believed that the risk of mistaken contributions should rest largely with the employer." *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund,* 976 F.2d at 836. The reasons are evident. It is far easier for employers than for funds to determine when a payment is mistaken. *Id.* More to the point, funds may "find it difficult to set aside accurate reserves to cover future claims," with the result that "beneficiaries of the funds may be undercompensated as a result of conservative judgments as to such reserves." *Id.* The latter problem would be exacerbated if plans had to anticipate restitution claims by unsuccessful participant claimants as well as by contributing employers. An employer overpayment claim can often be dealt with simply by offsetting future obligations against the overpayment, but an unsuccessful participant claimant is generally seeking a cash award, which could more directly affect the stability of the fund's asset reserves. This runs contrary to the "touchstone of ERISA," which is the "protection of the financial integrity of multiemployer pension funds." *Dumac Forestry Servs. v. Int'l Bhd. of Elec. Workers,* 814 F.2d at 83 (citing 29 U.S.C. § 1001). In sum, a very different equitable balance is presented when a restitution claim is brought by an unsuccessful participant claimant against a pension fund than when, as in *Thomas,* it is brought against an employer who has already received a refund. *See Thomas v. Bd. of Trs. of Int'l Union of Operating Eng'rs,* 1998 WL 334627 at *13, 1998 U.S. Dist. LEXIS 9210, at *37 (holding only that "as between Thomas and Local 542, Thomas has the superior equitable" claim).

The court further notes that *Thomas* relies on the Seventh Circuit decision in *Constr. Indus. Ret. Fund v. Kasper Trucking, Inc.,* 10 F.3d 465 (7th Cir.1993), in ordering restitution in favor of plaintiff. *Kasper Trucking,* however, presents a factual scenario significantly different from that at issue in *Thomas* or the one before this court. Kasper Trucking hired various drivers who owned their own rigs to transport freight. Pursuant to its original compensation agreement, defendant treated these drivers as employees and remitted certain pay deductions on their behalf to a multi-employer ERISA fund. Thereafter, defendant decided the drivers were independent contractors rather than employees, thereby making them ineligible for any pension benefits. When defendant sought restitution of the benefit contributions made on behalf of the drivers, the ERISA fund filed an interpleader action to determine the party entitled to the overpayment. In upholding the district court's decision that the monies should be returned to the truckers, Judge Easterbrook, writing for the panel, found that the contributions were really part of a compensation package bargained for between defendant and the truckers: "Kasper and its drivers agreed that Kasper, instead of paying all cash for labor and vehicles, would pay partly in cash and partly in pension contributions." *Id.* at 469. In short, the pension was a "form of deferred compensation." *Id.* The legal inability to use pension funds in this way did not, in the court's view, provide Kasper Trucking with an excuse to recoup for itself monies actually earned by the drivers. The par-

ties' original compensation agreement could lawfully be effected in two other ways: either defendant could take the contribution money and buy an annuity for the benefit of the drivers or the drivers could be given the money to make equivalent investments. *Id.* It was only because defendant would not agree to the former that the district court properly awarded the overpayment contributions to the drivers.

The obvious difference between the contribution overpayments at issue in *Kasper Trucking* and the overpayments in Flynn's case is that the *Kasper Trucking* contributions constituted compensation for real work performed by the drivers for the benefit of defendant. By contrast, Local 30's benefit contributions for Flynn are totally unrelated to any work performed by him for the Local. Indeed, even in *Thomas,* it is difficult to discern the factual basis for the court's conclusion that Thomas somehow "earned" the retirement contributions paid by Local 542 into its pension fund. *See Thomas v. Bd. of Trs. of Int'l Union of Operating Eng'rs, Local 542,* 1998 WL 334627 at *12, 1998 U.S. Dist. LEXIS 9210, at *34. Thomas claimed that Local 542 officials continued to pay his benefit contributions after he went to work for the International so that the local could benefit from having "one of their own" in that position. *Id.* 1998 WL 334627 at *1. But certainly it would be unethical, or at least appear unethical, for a local union to compensate an International employee in return for favoritism shown the local in matters coming before the International. Indeed, it was precisely for this reason that defendant Hanley opposed local benefit contributions for Flynn, Thomas, and any other International employees. Wisely, Flynn does not attempt to justify the Local 30 contributions on the grounds advanced by Thomas, and this court would not rely on such grounds to

order an award in Flynn's favor out of the local's pension funds.

Even if this court did not find Flynn's case distinguishable from *Thomas* and *Kasper Trucking,* plaintiff would not be entitled to restitution of benefit contributions made by Local 30 unless he could show that the defendant Trustees' refusal to award him restitution was "arbitrary and capricious" and that the "balance of equities" weighed in his favor. *Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund,* 976 F.2d at 836 (rejecting restitution claim by employer who made no favorable showing regarding equities); *accord Brown v. Health Care & Ret. Corp. of America,* 25 F.3d at 94 (holding that even when a funds' refusal to repay contributions "is arbitrary or capricious," the claimant "must still establish that the equities favor restitution"). Flynn cannot do this.

The only facts weighing in his favor are that his supervisor Treacy promised that plaintiff would continue to participate in the Local 30 pension plans even after going to work for the International and that, for more than a decade, the Local did make benefit contributions on Flynn's behalf. The Trustees' denial of restitution, however, is supported by far more compelling facts. First, Flynn was simply not entitled to have had any benefit contributions made on his behalf to the Local 30 funds after 1977 when he left that union's employ. Second, he is presently receiving pension benefits from the International, which was his actual employer for the years 1977–1992. Third, the monies wrongfully contributed by Local 30 to its pension funds on Flynn's behalf belonged to that union, not to Flynn. Certainly, Flynn was not a sole proprietor contributing his own money to the funds, like the plaintiffs in *Peckham v. Bd. of Trs. of Int'l*

*Bhd. & Allied Trades Union*, 724 F.2d 100. Neither was he a hired worker like the drivers in *Constr. Indus. Ret. Fund v. Kasper Trucking, Inc.*, 10 F.3d 465, who agreed to have part of their compensation for work actually performed contributed to certain pension plans. Indeed, if Local 30 had not erroneously contributed to its pension funds for Flynn, plaintiff would have no legal claim to the monies at issue. This leads to the final and most important factor weighing against Flynn's restitution claim. Local 30 cannot be viewed in the same light as a private employer free to commit its assets wisely or foolishly as it may choose. Its assets represent the contributions of union members, and its leaders operate under a fiduciary duty to use these monies in the best interest of the membership. As the Department of Labor found, it was simply not appropriate for the Local to make benefit contributions on behalf of an individual who was no longer a common law employee of the union. Neither would it have been appropriate for the Local's leaders to pay tens of thousands of dollars to a person who performed no work for the union. Yet that would be the net effect of ordering the "restitution" demanded by Flynn. Such a result would not be in the best interests of the full membership. Instead, equity is better served in this case by simply leaving the disputed contribution money in the Local 30 pension funds. In this way, the funds are protected from needless disruption of their assets. *See Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund*, 976 F.2d at 836.[10] Further, no party receives a windfall. The monies overpaid by the Local, which originated with the membership, can now inure to the benefit of those members insofar as they qualify for Local pensions.

Plaintiff's motion for summary judgment on his claim of equitable restitution is denied and, instead, judgment is entered in favor of defendants.

## III. State Law Claims

Flynn sues Local 30 for breach of contract, specifically, the failure to honor the commitment made by business managers Treacy and Hach that the Local would compensate Flynn with pension benefits for services rendered between 1977 and 1992. These same facts are relied on to support plaintiff's claim for unpaid wages pursuant to N.Y. Labor Law § 198 (McKinney 1986). Finally, Flynn charges the Local with negligent misrepresentation of his eligibility for pension benefits after 1977.

---

**10.** Judge Winter, in writing for the panel, explains the problems any restitution award presents for a benefit fund:

> [W]hen a particular. employee retires under a pension plan providing fixed benefits, the fund must calculate the level of benefits the employee has earned and must generally commit sufficient assets, e.g., purchase an annuity, to guarantee that the employee will receive the determined level of benefits. Both the determined level of benefits and the amount committed must be derived from the current calculation of the fund's total assets. If employers are allowed to recover overpayments and thereby reduce a fund's total assets, those who have already retired will have received too much because their benefits were calculated as a share of an inflated calculation of total assets. Future retirees will then receive too little. Although the repayments may not render a fund unstable, the loss of benefits may seem substantial to pensioners for whom even small sums are important. No doubt plans can provide that levels of benefits to particular retirees will be revised downward as necessary to refund mistaken contributions, but this loss of certainty among pensioners may not be worth the gain from correcting temporally remote overpayments by employers.

> *Id.*

At oral argument, plaintiff's counsel acknowledged that an award of summary judgment in defendants' favor on the ERISA claims would warrant dismissal of these state claims on jurisdictional grounds. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In fact, it appears that these claims are totally barred by ERISA.

The Supreme Court has ruled that ERISA § 502(a), 29 U.S.C. § 1132(a), the statute's civil enforcement provision, is the "exclusive remedy for rights guaranteed" by that statute. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 144, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Toward this end, ERISA § 514(a) explicitly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C. § 1144(a). In this way, Congress sought to avert a "patchwork scheme of [state] regulation" that would introduce "considerable inefficiencies in benefit program operation." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). Not surprisingly, the Supreme Court has consistently read ERISA's preemption provision broadly. *See Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 9 (2d Cir.1992) (reviewing Supreme Court jurisprudence regarding ERISA preemption). In *Ingersoll–Rand Co. v. McClendon,* 498 U.S. at 139, 111 S.Ct. 478, the Court unanimously ruled that a state law "relates to" an employee benefit plan if it "has a connection with or reference to such plan," whatever the state law's underlying intent. Thus, ERISA preempts any state laws or causes of action that "provide[] alternative enforcement mechanisms" for rights secured by the federal statute. *Plumbing Indus. Bd. v. E.W. Howell Co.,* 126 F.3d 61, 67 (2d Cir.1997) (quoting *New York State Conference of Blue Cross & Blue Shield Plans v. Travel-*

*ers Ins. Co.,* 514 U.S. 645, 658, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)); *accord Lopresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir.1997) (holding that "alternative theor[ies] of recovery for conduct actionable under ERISA" are preempted by ERISA).

Flynn's state law claims all propose theories under which Local 30 would have to pay him the pension benefits otherwise denied by the plan Trustees. Such claims necessarily "relate to" the Local's benefit plans and are, therefore, preempted by ERISA. *See Smith v. Dunham–Bush,* 959 F.2d 6. *Smith* involved facts similar in many respects to the ones at issue in this case. Defendant employer asked Smith to transfer from its United Kingdom affiliate, where he had worked for many years, to its United States affiliate. Smith was hesitant because of the inferiority of the United States affiliate's pension plan. Defendant promised to supplement the American plan to ensure Smith the equivalent of the benefits available to him in the United Kingdom. Relying on this promise, Smith moved to the United States, the employer reneged on the promise, and Smith sued for breach of contract and negligent misrepresentation under Connecticut law. Smith argued that his claims were not preempted by ERISA because they did not "relate to" a benefits plan. Further, he asserted that he was suing his employer only in his capacity as an employer, not as an administrator of the relevant benefit plan. The Court of Appeals disagreed

[T]he existence of [the employer's] pension plan would be a critical factor in establishing the extent of liability under state common law. In reality [plaintiff's] suit represents an attempt to supplement the plan's express provisions and secure an additional benefit. Smith's cause of action therefore relates

not merely to his benefits, but to the essence of the plan itself.

*Id.* at 10.

The Court of Appeals recognized that its holding would leave Smith with "no adequate remedy for the alleged breach of contract and misrepresentation." *Id.* at 11. Nevertheless, it joined the Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits in holding that "the preclusion of remedy does not bar the operation of ERISA preemption." *Id.* (and cases cited therein). Whatever the "surface appeal" of a state law claim that distinguished between the broken promise of an employer and a plan's denial of benefits, it "would countermand Congress's express directives" to accommodate such a claim. *Id.* at 12. Not only would it "irreparably undermine ERISA and ... seriously discourage employers from adopting such plans[, e]ventually, it would reduce the level of financial security for working people." *Id.*

The analysis in *Smith* applies equally to Flynn's state law claims against his employer, Local 30. The court hereby dismisses these claims with prejudice as preempted by ERISA.

### Conclusion

For the reasons stated, plaintiff's motion for partial summary judgment on his restitution claim is denied, and defendants' motion for summary judgment on all ERISA claims is granted in its entirety. Plaintiff's state law claims against Local 30 are dismissed with prejudice as preempted by ERISA. The Clerk of the Court is to enter judgment in favor of defendants and mark this case closed.

*SO ORDERED.*